James **CARTER**, Appellant

v.

**BULLITT HOST, LLC (d/b/a Holiday Inn Express), Appellee.**

2013–SC–000325–DG

Supreme Court of Kentucky.

RENDERED: SEPTEMBER 24, 2015

Counsel for Appellant: Aaron Neal Herrington, Christopher Morris, Marc Kevin Crahan, Hargadon, Lenihan & Herrington, PLLC, 713 West Main Street, Louisville, Kentucky, 40202.

Counsel for Appellee: R. Hite Nally, Weber & Rose, PSC, 471 West Main Street, Suite 400, American Life Building, Louisville, Kentucky 40202.

OPINION OF THE COURT BY
JUSTICE NOBLE

The Appellee, Bullitt Host, LLC, d/b/a Holiday Inn Express, operates a hotel. The Appellant, James Carter, sued Bullitt Host for injuries he suffered in a fall on ice on the hotel property. He alleged negligence in Bullitt Host's maintenance of the entryway of the hotel during or soon after a severe snow storm. The hotel obtained summary judgment on the grounds that the icy patch on which Carter fell was a naturally occurring open-and-obvious hazard for which there can be no liability under *Standard Oil Co. v. Manis*, 433 S.W.2d 856 (Ky. 1968). The Court of Appeals affirmed. The parties have raised, among other things, broad questions of the continued viability of *Manis* and how naturally occurring hazards, such as ice and snow, should be treated after this Court's recent open-and-obvious cases. Because the *Manis* rule was established under contributory negligence principles, and the law of the Commonwealth has been since 1984 by case law, *Hilen v. Hays*, 673 S.W.2d 713 (Ky. 1984), and since 1988 by statute, KRS 411.182, that *all* tort actions must provide for the apportionment of fault among all parties to an action, the *Manis* rule is no longer viable, and we hold that all open and obvious hazard

cases, including obvious natural outdoor hazard cases, are subject to the comparative fault doctrine.

## I. Background

James Carter and his family were travelling from Texas through Kentucky on February 11, 2008. That afternoon, as they travelled through Bullitt County, Kentucky, they encountered a severe winter storm. They stopped in Hillview, Kentucky, which is in Bullitt County very near the Jefferson County line, and spent the night at a Holiday Inn Express operated by Bullitt Host, LLC ("the hotel").

The next morning, around 6:50 a.m., Carter exited the front of the hotel, walking from the lobby through a pair of doors, and proceeded under what is described alternately in the briefs as a covered walkway or a canopy, and in various parts of the record as an atrium, awning, carport or porte-cochère.[1] Based on descriptions and photographs of the area in the record, the latter two terms best articulate it. Regardless of how it is characterized, however, the area was typical of the front entrances of many hotels and provided a covered area into which a car could be driven and left temporarily while the guest dealt with the registration desk and handled luggage. The area had a high ceiling and roof held up by four pillars extending from above the front entrance of the hotel over the sidewalk and farther out over part of the parking lot. Though the area was covered, three of its sides were open to the elements.

In a discovery deposition, Carter stated that the lights of the covered area were not on. He also stated that he did not see any snow or ice under the cover, though he acknowledged knowing there was snow out in the parking lot. He also admitted that

before he left the building, he saw that the area under the cover was wet. Because of the wetness, he walked "extremely slowly," admitting that he knew he "need[ed] to be safe" when walking to his car. He claimed, however, that he did not expect ice under the carport, because he believed the temperature outside to be around 40 degrees Fahrenheit and well above freezing, though he also said at one point that his main concern when walking to his car was that he "was cold." But he reiterated that he did not expect ice on the ground. When asked how there could have been ice on the ground if the temperature was 40 degrees, he claimed that he did not know, though he knew it had snowed the day before. He was then asked, "So you knew there was a possibility of there being ice because it snowed the day before?" He replied, "Well, not from where I'm from[,] it doesn't do that." He then stated bluntly: "So no. I was not aware of it [ice] to be there."

As it turned out, there was ice under the carport. And as Carter approached the edge of the covered area, he slipped and fell. He stated in his deposition that the fall occurred eight to ten feet inside the edge of the covered area (and seven to ten feet from the closest outer pillar). He also drew figures on photographs and a diagram to show his position with respect to the edge of the cover and his orientation to the hotel entrance.

Carter broke his ankle in the fall. He lay on the ground for several minutes and, according to his deposition, he noticed only then that there was transparent ice on the ground. He stated that several minutes after the fall, two hotel employees helped him back into the lobby. He claimed that at that point, one of them, when asked by the other what happened, said, "He fell out

---

1. The deposition in which this word appears     spells it phonetically as "porticoshare."

there. Maintenance hasn't been out here yet to clean up or salt or do anything."

Carter was taken by ambulance to a local hospital and treated. After making his way home to Texas, he received additional treatment, including surgery to repair his injured ankle.

Eventually, Carter filed suit against the hotel, alleging negligence, in Jefferson Circuit Court. The hotel moved for summary judgment, arguing that a landowner cannot be liable for injuries to an invitee caused by an open-and-obvious, naturally occurring hazard under *Standard Oil Co. v. Manis*, 433 S.W.2d 856 (Ky. 1968). Carter argued that *Manis* was no longer the law after *Kentucky River Medical Center v. McIntosh*, 319 S.W.3d 385 (Ky. 2010), which changed how the open-and-obvious doctrine worked in Kentucky and which had been rendered the previous summer. The trial court denied this motion, concluding that there were material questions of fact about breach and causation, and questioning whether the hazard had been open and obvious, despite Carter's safe navigation of the parking lot the evening before, at least in part because overnight precipitation might have changed the conditions.

Some months later, the hotel again moved for summary judgment, again alleging that the danger had been open and obvious and that no liability could exist under *Manis*. This time, the trial court granted the motion, finding that the ice was open and obvious, that the carport was not enclosed (and thus was not an indoor location), and that the injury was not foreseeable because Carter had safely walked through the parking lot the evening before his fall.

Carter appealed this decision. The Court of Appeals affirmed, concluding that Carter was aware of the snow and ice outside and that there could be ice in his path, thus making the unseen ice he slipped on open and obvious. The Court read *McIntosh* narrowly to mean that the open-and-obvious doctrine still barred liability and that there was an exception only if the injured party had been distracted. Applying the open-and-obvious doctrine, the court held that the hotel had not breached a duty to Carter.

This Court granted discretionary review, in part to address the applicability of *McIntosh* to these facts, but also the applicability of another recent case addressing the open-and-obvious doctrine, *Shelton v. Kentucky Easter Seals Society, Inc.*, 413 S.W.3d 901 (Ky. 2013).

## II. Analysis

The hotel argues that this case is and should be controlled by *Standard Oil v. Manis*, 433 S.W.2d 856 (Ky. 1968), which established the general rule "that *natural outdoor hazards* which are as obvious to an invitee as to an owner of the premises do not constitute *unreasonable* risks to [the invitee] which the landowner has a duty to remove or warn against." *Id.* at 858. This 47–year–old doctrine arose when Kentucky was still a contributory negligence state, though the case purports to rule based on a foreseeability analysis to arrive at the nonexistence of a duty rather than contributory negligence of the plaintiff.

The *Manis* Court highlighted that there is a "somewhat different problem" with events that occur outdoors as a result of "exposed" natural conditions than there is with events that occur indoors and from artificial conditions. The Court accepted as fact that "dangers that are created by the elements, such as forming of ice and the falling of snow, are universally known," *id.* (quoting *Ferguson v. J. Bacon & Sons*, 406 S.W.2d 851, 852 (Ky. 1966)), and because the fall occurred outside, due to a

natural hazard "exposed in broad daylight," *id.* at 859, Manis faced an obvious natural hazard through which he proceeded, and he caused his injuries when he failed to see the ice and fell.

A close reading of *Manis,* however, reveals that contributory negligence was necessarily a large part of the Court's reasoning. In concluding that the oil company could not have reasonably foreseen that Manis would proceed in the face of an obvious hazard, the Court focused on Manis's conduct to determine that the oil company was not negligent:

> Appellee was thoroughly familiar with the structure. He was fully aware of the accumulation of ice and snow in the area. He saw that the level part of the walkway was wet, indicating that melting ice had been there. That there might be on the platform unmelted ice, or refreezing water, was a distinct possibility. Under these circumstances we are of the opinion defendant could not have reasonably foreseen that appellee would proceed without exercising commensurate caution.

*Id.*

In other words, the Court held that the oil company could not have reasonably foreseen the negligence of the plaintiff. As such, it was entitled to believe that the plaintiff would look after his own safety. But an unstated corollary to this is that if the plaintiff was negligent *to any degree,* under a contributory-negligence standard, then the defendant could not be found liable. The obviousness of the hazardous condition put the plaintiff on as much notice of the hazard as the landowner had, meaning the plaintiff was necessarily at fault, to some degree, in proceeding in the face of the hazard. *Cf. Kentucky River Medical Center v. McIntosh,* 319 S.W.3d 385, 389 (Ky. 2010) (discussing the open-and-obvious doctrine as an application of contributory negligence). Because the law of contributory negligence placed the entire burden for his safety on the plaintiff himself, *all* the fault was assigned to the plaintiff. Thus, under contributory-negligence law, it made sense to say that the defendant had no duty to prevent the negligence of the plaintiff. It certainly had no actionable duty because it could not be held liable even if negligent.

But even then, the rule stated in *Manis* was not without exceptions, as was noted when the *Manis* Court distinguished the case of *City of Madisonville v. Poole,* 249 S.W.2d 133 (Ky. 1952). *Manis* had relied on *Poole* because it also involved a slip and fall on ice. Mrs. Poole had gone at night to the front door of a clubhouse owned by the city to attend an event being held there. The door area was covered by a porch and was unlit, and Mrs. Poole did not see a patch of ice on which she slipped and fell, and was injured. The case went to a jury, which returned a verdict in Mrs. Poole's favor.

The *Poole* Court held that, under those conditions, it was appropriate to allow the question of the city's negligence to proceed to the jury, rather than its being resolved with a peremptory instruction, because there was a factual question whether the city should have known of the unsafe condition and remedied it.

The *Manis* Court noted that those facts were different than those before it, since it was night, the porch was not lighted and the city "could perhaps foresee that the plaintiff would assume the doorway was free of ice," *Manis,* 433 S.W.2d at 858, and thus the hazard was not obvious. If the hazard was not obvious, then Mrs. Poole was not at fault.

Importantly, however, in the absence of her own negligence, the city *did* owe a duty of ordinary care toward Mrs. Poole,

and could be found liable if it were negligent. *See Poole*, 249 S.W.2d at 135 ("The owner or possessor of the property owes him the active, positive duty of keeping those parts of the premises to which he is invited, or may reasonably be expected to use, in a condition reasonably safe for his use in a manner consistent with the purpose of the invitation. If the possessor knows, or by the exercise of ordinary care or reasonable diligence could discover a natural or artificial condition which, if known, he should realize involves an unreasonable risk to the invitee and does not remedy the condition or serve fair warning of peril, he is negligent."). Thus the mere fact that the accident involved outdoor ice did not bar liability for the city. And that is precisely what the Court found when it affirmed the judgment for Mrs. Poole, and noted that the jury had been instructed appropriately on contributory negligence, and it obviously had not found any on the part of Mrs. Poole.

So the *Manis* Court not only set a rule about obvious outdoor hazards, it also acknowledged that situations could exist where a hazard was not obvious that would require a different analysis, such as in *Poole*. Under contributory-negligence law, even though courts spoke of whether or not a duty existed, they were not simply making an arbitrary declaration about duty. Saying that something was obvious was simply another way of saying that if a plaintiff was injured by proceeding in the face of an obvious danger, then the plaintiffs own negligence negated any duty otherwise owed by the defendant.

The *Manis* Court found that the facts in *Manis* supported its conclusion that the outdoor hazard *was* obvious. But it reached that conclusion by establishing how it had to have been obvious to Manis, even though he claimed that he did not see the ice until after he had fallen on it. In short, the net result of the Court's analysis was that the fall was Manis's fault because he missed all the signs that he *should have* seen and thus avoided the hazard. *He* was negligent. And, as the Court noted, it would not hold the oil company responsible for Manis's failure to exercise "commensurate caution." *Manis*, 433 S.W.2d at 859. Although the Court wrote about foreseeability and the landowner's duty, the analysis is also couched in terms of the plaintiffs negligence. Thus, the case must be examined through the lens of contributory negligence.

And a subsequent case, *Schreiner v. Humana, Inc.*, 625 S.W.2d 580 (Ky. 1981), focused on the part of *Manis* that acknowledged that the outdoor natural hazard had to be obvious to the plaintiff in order to find her at fault and thus negate a defendant's duty. Mrs. Schreiner was dropped off in front of her doctor's office on her way to an appointment. There was considerable snow on the ground, but she first approached the building through a clear track that had been melted by traffic. When she got to the sidewalk leading into the building, it had been cleared of snow. She described the sidewalk as looking "perfectly clear." *Id.* at 580. But, just as she stepped onto the sidewalk, she slid on a transparent layer of ice, fell, and fractured her hip. She sued the building owner, Humana, for negligently failing to maintain the premises properly and to warn of the ice hazard.

The *Schreiner* Court found that there was an issue of obviousness that created questions of fact. The Court found that it could not say, as a matter of law, that the outdoor natural hazard was obvious as the *Manis* Court had done and stated, "We must disagree, however, with respondent's assertion that Mrs. Schreiner's knowledge of the icy conditions was in parity [with Humana's]." *Id.* at 581. The Court found

that on a *summary judgment* motion, Mrs. Schreiner's statement that she could not see a hazard in the walkway, and the evidence that Humana had been notified of the danger before her fall and had done nothing, created questions of fact as to whether Humana knew of the condition.

And the Court specifically addressed the possibility of Mrs. Schreiner's *contributory negligence*, finding that summary judgment could not issue as a matter of law because on that question "[t]his conclusion incorrectly assumes that one who falls on ice is not exercising due care in all cases," *id.* and "[m]ore importantly, it ignores Mrs. Schreiner's testimony that the ice was not visible and the walkway appeared clear," *id.* The Court also pointed out that the ultimate question of liability was not before it; rather, the only question presented was whether summary judgment was proper, and the Court concluded that it was not under the facts of the case. Presumably, if the case went to trial on remand, the jury would have been given a contributory negligence instruction against Mrs. Schreiner, because that remained the law at that time.

We have hesitated at times to say that the open-and-obvious doctrine is completely "a vestige of contributory negligence," *Shelton*, 413 S.W.3d at 910, though we have stated that such a claim is "compelling," *id.* But our close review of the cases above establishes that the rule previously applied in the snow-and-ice open-and-obvious cases is readily explained by reliance on the doctrine of contributory negligence, rather than other concerns. *Cf. McIntosh*, 319 S.W.3d at 389 (discussing the open-and-obvious doctrine as an application of contributory negligence). Though the cases are often doctrinally imprecise, *see id.* (noting that "the precise doctrinal rationale was not carefully considered" in older cases), they are unquestionably "rooted in the bygone era of contributory negligence," *Shelton*, 413 S.W.3d at 904.

But contributory negligence is no longer the law.

Indeed, before *Manis* came to the forefront again after *Schreiner*, this Court decided *Hilen v. Hays*, 673 S.W.2d 713 (Ky. 1984). In that case, this Court adopted the rule of pure comparative fault, displacing the old rule of contributory negligence. Under contributory negligence, any negligence on the part of a plaintiff was a *complete bar* to the liability of a defendant. Comparative fault offered a means of avoiding the sometimes draconian effects of contributory negligence, and placed fault on any party that had a negligent part in causing the plaintiff's injury, not excluding the plaintiff himself. The *Hilen* Court found that fundamental fairness required the change to comparative fault because contributory negligence "fails to distribute responsibility, in proportion to fault," *id.* at 718 (quoting *Li v. Yellow Cab Co.*, 13 Cal.3d 804, 119 Cal.Rptr. 858, 532 P.2d 1226, 1230–31 (1975)), and because comparative fault was "irresistable to reason and all intelligent notions of fairness," *id.* (quoting *Li*, 119 Cal.Rptr. 858, 532 P.2d at 1231).

This sea change in Kentucky tort law was not a spur-of-the-moment decision. As Justice Leibson noted in *Hilen*, the contributory-negligence doctrine was court made, not statutory, and did not exist in the common law of England in 1792, which our constitution incorporated. *Id.* at 715. Contributory negligence thus bore "the imprimatur of neither the Kentucky constitution nor the General Assembly." *Id.* at 716. Beginning in 1910, other states began adopting comparative fault instead of contributory negligence, either by statute or court rule, such that at the time of the *Hilen* decision, 41 of 50 states followed

comparative fault rather than contributory negligence. *Id.* at 716–17.

After *Hilen*, the rule in Kentucky is clear: "[W]here contributory negligence has previously been a complete defense, it is supplanted by the doctrine of comparative negligence. In such cases contributory negligence will not bar recovery but shall reduce the total amount of the award in the proportion that the claimant's contributory negligence bears to the total negligence that caused the damages." *Id.* at 720. Any defense based on contributory negligence must also be supplanted by comparative fault. *Cf. id.* at 716 n. 2 (noting that "the form of contributory negligence involved in this case is the old common law doctrine of assumption of the risk").

But a mere three years after *Hilen*, the applicability of *Manis* was again front and center in *Corbin Motor Lodge v. Combs*, 740 S.W.2d 944 (Ky. 1987). The plaintiff in *Corbin Motor Lodge* raised *Hilen* to argue that the rule in *Manis* no longer applied when his case was tried. The Court responded that if *Manis* was still the law, it barred liability against the lodge. Instead of analyzing whether *Hilen* had supplanted *Manis*, however, the Court examined how the *Manis* rule arose, and peremptorily announced that *Manis* had not been premised on the contributory negligence of the plaintiff in that case, but on the fact that the defendant owed no duty to the plaintiff. Simply saying *Manis* put outdoor natural hazards in a special category, the Court failed to examine *why* the defendant had no duty.

But a simple look back to *Manis* would have made it obvious that the oil company had no duty because Manis himself was, or should have been, just as aware of the outdoor natural hazard as the oil company. That fact made him contributorily negligent, which negated any duty of the defendant under the law at the time. So it was not incorrect to say, when *Manis* was written, that the oil company had no duty to Manis as a matter of then-applicable law.

It was therefore unquestionably error for the *Corbin Motor Lodge* Court to make that same ruling and continue to apply *Manis* as a full bar to a defendant's liability. As a matter of its own law, as written in *Hilen* with only one change in membership on the Court (Justice Lambert who wrote the *dissent*, which was joined by Justice Leibson), the Court was obligated to at least attempt to apply *Hilen*.[2] Because it did not, we have had another 28 years of the *Manis* rule creating a legal anomaly excepting obvious outdoor natural hazards from the comparative-fault doctrine, even though that doctrine governs every other area of tort law. Only in "open and obvious" cases have we made an exception to the comparative-fault analysis in tort cases absent a specific statutory direction otherwise.

One need only look at how the rule of *Hilen* and application of KRS 411.182, the comparative fault statute enacted in 1988, would affect *Manis* and *Corbin Motor Lodge*, if applied, to see that we have been, indeed, perpetuating the "sanctification of ancient fallacy." *Hilen*, 673 S.W.2d at 717.

Under comparative fault, the oil company's duty of ordinary care would not be

---

**2.** The fact that the Court did not apply *Hilen* to *Corbin Motor Lodge* may have been instrumental in the passage of KRS 411.182, which establishes comparative fault by statute, in 1988, the next session of the General Assembly. Certainly, one is invited to so speculate given that the General Assembly had considered comparative fault in most sessions since 1968 and failed to pass a statute requiring it before and after *Hilen* until 1988. *Hilen v. Hays*, 673 S.W.2d 713, 717 (Ky. 1984).

negated just because Manis should have seen the ice. Indeed, as we have recently held, that openness or obviousness of a hazard by itself cannot obviate a landowner's duty of reasonable care or any liability resulting from a breach of that duty. *See Shelton*, 413 S.W.3d at 907 ("Certainly, at the very least, a land possessor's general duty of care is not eliminated because of the obviousness of the danger."). Instead, under comparative fault, the trier of fact would determine the percentage of fault "allocated to each claimant, defendant," KRS 411.182(1)(b), if the oil company was as aware of the ice as Manis was held to be, and if its failure to remedy the problem helped cause harm to Manis. Manis's lawsuit over his fall on the ice was certainly a tort action, and "all tort actions" are covered by the comparative-fault statute unless another statute says otherwise.

Similarly, if comparative fault were applied to the plaintiff in *Corbin Motor Lodge*, he likely would not get a favorable apportionment given his admission about his knowledge of the ice and decision to proceed anyway. But he would be entitled to have the matter of comparative fault considered by a trier of fact and an apportionment made.

Supporters of continued applicability of the *Manis* rule might argue that the comparative-fault statute only requires allocation of fault among the parties if a party is actually at fault, and that the oil company in *Manis* and the lodge in *Corbin Motor Lodge* could not be at fault because they had no duty to the plaintiffs. But the legal reason for a no-duty finding—plaintiffs were aware of the danger and thus caused their own injuries by proceeding—is nothing more than applying a contributory-negligence standard, which is no longer the law of this state.

■ Or a supporter of the *Manis* rule might argue that *stare decisis* demands continued application of the rule, noting as *Corbin Motor Lodge* did that a special rule applies to outdoor snow and ice. *Corbin Motor Lodge*, 740 S.W.2d at 946. But stare decisis does not, and indeed cannot, require application of a court-made rule in the face of a statute to the contrary; or, for that matter, a later-in-time court ruling to the contrary. It almost goes without saying that absent a constitutional bar or command to the contrary, the General Assembly's pronouncements of public policy are controlling on the courts, as this Court has ruled countless times.[3] If *Manis* is contradicted by KRS 411.182, which it surely is, then the rule it supposedly embodies cannot have the force of law any longer.

And our Court has already, very recently, addressed whether the openness and

---

3. Such decisions include: *Benningfield ex rel. Benningfield v. Zinsmeister*, 367 S.W.3d 561, 566 (Ky. 2012) ("While some may believe this is a bad rule or poor policy, it is the prerogative of the General Assembly to set public policy. By enacting the statute, the legislature has proclaimed the public policy of this state, and this Court is bound to interpret the statute to effectuate that policy." (citation omitted)); *Commonwealth ex rel. Cowan v. Wilkinson*, 828 S.W.2d 610, 614 (Ky. 1992), *overruled on other grounds by Commonwealth ex rel. Conway v. Thompson*, 300 S.W.3d 152 (Ky. 2009) ("The establishment of public policy is granted to the legislature alone. It is beyond the power of a court to vitiate an act of the legislature on the grounds that public policy promulgated therein is contrary to what the court considers to be in the public interest. It is the prerogative of the legislature to declare that acts constitute a violation of public policy."); *Peak v. Akins*, 237 Ky. 711, 36 S.W.2d 351, 352–53 (1931) ("There is no higher authority than the Legislature when acting within the limits of the state and federal Constitutions in determining the public policy of a state. That being true, an act of the Legislature declaring the public policy on a certain question cannot in the nature of things be contrary to public policy.").

obviousness of a danger can be a complete defense in the face of modern tort law in *Shelton v. Kentucky Easter Seals Society, Inc.*, 413 S.W.3d 901 (Ky. 2013). *Shelton* specifically answered questions about duty and breach, and held that while considerations of the obviousness of a hazard often were traditionally deemed to go to the existence of a duty, such considerations were better addressed in deciding whether the defendant breached the almost universally accepted general duty of ordinary care owed by every person to all other persons. Instead of killing a case prematurely because of the obvious nature of a hazard, most non-frivolous cases will now be allowed to mature fully and go before a jury to determine whether there has been tortious conduct at all and, if so, to apportion fault among the parties.

Although *Shelton* involved an indoor, man-made hazard, its rule is generally applicable to all negligence cases. That some cases, such as this one, might involve naturally occurring outdoor hazards is a distinction without a difference. The hazardous condition in *Shelton* was as obvious to Mrs. Shelton as it was to the hospital. Mrs. Shelton's daughter had complained to the hospital about various wires, cables or cords used for the medical equipment around, or that was part of, her father's bed. Obviously, the hospital already knew about its own equipment as well. Mrs. Shelton assisted daily in her husband's care, and had to cross the wires to get to his side. She had "tried to avoid" and "be careful" around the cords. Her ankle became entangled in the cords as she was turning to leave after rubbing cream on her husband's back and kissing him goodnight. She fell forward, and fractured the patella on her left knee.

In reversing the Court of Appeals, which had affirmed the lower court's grant of summary judgment under the open-and-

obvious rule, this Court held that a land possessor's general duty of ordinary care is not eliminated simply because a hazard is obvious. The question is rather whether the landowner could reasonably foresee a land entrant proceeding in the face of the danger, which goes to the question whether the universal duty of reasonable care was breached. In Mrs. Shelton's case, it was obvious that she was going to continue to care for her very sick husband, wires or no wires. After *Shelton*, if such events are foreseeable and the landowner has not made reasonable efforts to correct the problem which causes harm to a plaintiff, then the landowner has *breached* his general duty of reasonable care. Additionally, the Court gave guidance about going forward with an "open and obvious" tort claim in the same manner that any tort claim would be tried. *Id.* at 917–18.

▮ The open-and-obvious nature of a hazard is, under comparative fault, no more than a circumstance that the trier of fact can consider in assessing the fault of any party, plaintiff or defendant. *Id.* at 911–12. Under the right circumstances, the plaintiffs' conduct in the face of an open-and-obvious hazard may be so clearly the only fault of his injury that summary judgment could be warranted against him, for example when a situation cannot be corrected by any means or when it is beyond dispute that the landowner had done all that was reasonable. *Id.* at 918. Applying comparative fault to open-and-obvious cases does not restrict the ability of the court to exercise sound judgment in these cases any more than in any other kind of tort case.

We did not get to this point in stating the law without considerable confusion since *Corbin Motor Lodge* about how to reconcile duty pronouncements made under contributory-negligence law and common-sense recognition that just because a

plaintiff may have been negligent to some degree, that need not be the *whole cause* of her resulting injury. And we have struggled for years with articulating the legal reasoning to support completely excusing a landowner in open-and-obvious premises-liability cases. On their face, these cases create situations that fly in the face of fundamental fairness, which is the basis of comparative fault. And, simply declaring that there is, or is not a duty without analyzing the effect of comparative fault, which is our current law, does nothing to alleviate confusion over the policy and doctrinal anomaly created by the open-and-obvious hazard rule.

This confusion is reflected in this Court's evolution in its opinions from *Kentucky River Medical Center v. McIntosh,* 319 S.W.3d 385 (Ky. 2010), where we blurred the line about foreseeability between duty and breach, to *Shelton,* where we established that foreseeability applies to breach of the general duty of ordinary care applicable to both plaintiffs and defendants, and finally to this case, where we establish that liability—responsibility—under Kentucky law must be determined based on the principles of comparative fault.

In light of all other tort law, this is not a radical departure. When compared to the benefits defendants have been receiving from having their duty defined by a remnant of contributory negligence, this is admittedly unwelcome. But despite the language in *Manis,* what its holding really meant was that when courts say the defendant owed no duty, they usually mean only that the defendant owed no duty *that was breached* or that he owed no duty *that was relevant on the facts.* "And without breach, there can be no negligence as a matter of law." *Shelton,* 413 S.W.3d at 912. Because a plaintiffs negligence prevented any liability against a defendant under contributory negligence, the defendant had no duty that was relevant under that doctrine, and the question of breach was never reached.

But under comparative fault, every person has a duty of ordinary care in light of the situation, and that duty applies equally to plaintiffs and defendants. For fault to be placed on either party, a party must have *breached* his duty; and if there is a breach, fault must be apportioned based on the extent a party's breach caused or helped cause harm to the plaintiff.

But it is just as true under comparative fault as it has always been that if a landowner has done everything that is reasonable under the circumstances, he has committed no breach, and cannot be held liable to the plaintiff. The difference under comparative fault is that a landowner is not excused from his own reasonable obligations just because a plaintiff has failed to a degree, however slight, in looking out for his own safety. The *Manis* rule, at least as articulated in later cases like *Corbin Motor Lodge,* is the antithesis of this.

The basic negligence tort paradigm has never changed: duty, breach, causation, damages. But under contributory negligence principles, tort analysis never got to the breach question if it was determined that the plaintiff had any fault. While it is just that a plaintiff be responsible for harm that he causes himself, it is not just for him to bear all the liability if another negligently contributed to his injury. (Obviously, "contributed" is used here in its ordinary meaning, not as a legal doctrine.)

*Manis* was technically correct when it was written, because its holding was the inevitable result under contributory-negligence principles. But it is not correct under the law of comparative fault. *Man-*

299

*is* is out of step with our comparative fault law, and thus it cannot apply under the law and facts of this case.

■ Applying this understanding to the facts of the present case, there are questions of fact about whether, and to what degree, the hotel acted reasonably with respect to the icy hazard under its carport. If the hotel knew or should have known of the hazard and failed to take reasonable steps with respect to it, then the hotel may be found liable to the extent that fault is apportioned to it. At the same time, there are questions about whether Carter acted with ordinary care for his own safety. What constitutes reasonable conduct will always be dictated by the circumstances a person encounters.

Here, to recap Carter's claim, the exit of the hotel opened onto a paved area which was covered by a roof. He was leaving the hotel to resume his trip. It was early morning, and he claims that it was dark but the area was not lighted. He testified that there was no visible snow and ice where he proceeded to walk. It is disputed whether the storm was ongoing, and while further proof may lead the trial court to consider whether the ongoing nature of the storm had a bearing on what reasonable conduct the hotel should have done in the exercise of ordinary care, that is not before us now. Carter was at the hotel as a business invitee and thus furthered the hotel's business interest, and he furthered his own interest because he needed shelter during the storm of the night before.

Under these facts, which we must construe as true on a summary judgment motion, there clearly remain questions of fact about whether Carter or the hotel breached their duty of ordinary care: Carter for his own safety, and the hotel for the safety of its paying guests. And, even if Carter were negligent, under comparative fault, he has the right to determine if there were any negligence on the part of the hotel that contributed to his injuries, and then to have a jury apportion fault. That proof is not before us because the trial court granted summary judgment against Carter.

■ Finally, there are those who would say that the rule in *Manis* should continue to be the law because snow and ice, or other natural hazards, are different from indoor hazards, and thus should be accorded a separate category or special status. But it has always been the law that a landowner's duty of reasonable care includes keeping the premises in a reasonably safe condition. If a person owns or occupies land, there are attendant responsibilities that come with that possession, which the possessor is in the best position to address. This is especially the case where the landowner operates a business and entices customers to the land where they encounter a dangerous hazard.

And when all that is actionable is unreasonable conduct, the land possessor who acts reasonably under the circumstances has no fault. Indeed, there is nothing that makes snow and ice or other natural, outdoor hazards any more dangerous than some man-made outdoor or indoor hazards. And if the landowner is negligent at the same time as the plaintiff, why should all the burden be placed on the party that was injured? The answer, at least since the adoption of comparative fault, is that it should not. The loss should be shared according to the parties' respective share of the fault.

It is true that no one controls the weather; but neither is anyone reasonably expected to do so. A landowner is held only to reasonable conduct. The gravamen of a tort claim has always been that harm has come to a plaintiff because of the *unrea-*

*sonable* conduct of the tortfeasor. Such conduct need only be the conduct that the ordinary person would not do under the same circumstances, in order to be tortious. And the plaintiff must likewise act in a reasonable manner for his own safety. Trial courts and juries have been ably applying this concept since torts became actionable. There is no valid reason to believe that they cannot do so when bad weather or any other natural hazard is involved.

We have spun our wheels long enough trying to drive open-and-obvious hazard cases the wrong way down a rocky road built on contributory negligence concepts when all the rest of tort law runs smoothly on comparative-fault principles. It is time to clearly say that all torts, as the statute requires, are subject to a comparative fault analysis.

### III.  Conclusion

For the forgoing reasons, the Court of Appeals is reversed, and this case is remanded to the trial court for proceedings consistent with this opinion.

All sitting. Minton, C.J.; Barber and Keller, JJ., concur. Venters, J., dissents by separate opinion in which Abramson and Cunningham, JJ., join.

VENTERS, J., DISSENTING:

I respectfully dissent because I believe the Majority embarks upon an unwise departure from the sound social policies realized in the *Manis* rule. Based upon a faulty premise, the majority abolishes the well-established *Manis* rule that has worked well in Kentucky for nearly 50 years and continues as the rule in many states.

The flaw of the majority's reasoning is signaled by this statement, found on page 14 of its opinion: "[T]he *Manis* rule cre-

ate[s] a legal anomaly excepting obvious outdoor natural hazards from the comparative-fault doctrine." That is incorrect, as explained below. For more than thirty years, the *Manis* rule has co-existed in complete harmony with comparative fault. Moreover, the majority's premise reveals its conflation of two distinctly different concepts: duty and liability, or more directly, the existence of a duty and the allocation of liability. The *Manis* rule pertains to the existence of a legal duty. The existence of a legal duty is a policy determination made legislatively by statute or judicially by common law decisions. Comparative fault, like contributory negligence, pertains to how liability (or, if you prefer, "fault") for an injury will be allocated *after* it has been determined that one or more of the parties breached a duty imposed by law. Nothing about the *Manis* rule is incompatible with comparative fault.

Because the majority conflates the concepts of duty and liability, it erroneously concludes that the *Manis* rule is an offshoot of contributory negligence, and from there it reasons that the abrogation of the latter doctrine requires the demise of the former. The *Manis* rule is *not* derived from contributory negligence; it has been proven to be sound social policy operating without complication or injustice in comfortable harmony with comparative fault. The *Manis* rule is as viable now as it was in 1968 when the case of *Standard Oil Co. v. Manis*, 433 S.W.2d 856 (Ky. 1968), was decided. The circumstances that validated the wisdom of the rule when it was articulated have not changed. As long as the hazards of naturally-occurring accumulations of snow and ice remain intractable, there is no reason to change the rule.

The claim that the *Manis* rule survives only as a remnant of the by-gone era of contributory negligence reflects a fundamental misperception about the develop-

ment of tort law that we dispensed with in *Henson v. Klein*, 319 S.W.3d 413 (Ky. 2010), where we rejected a similar claim that the sudden emergency doctrine was an outmoded vestige of contributory negligence incompatible with comparative fault. Like the *Manis* rule, the sudden emergency doctrine pertains to the question of whether duties exist and what the duties require. In no way does it affect, nor is it affected by, the method by which liability for a breach of those duties is allocated. We said in *Henson:*

> Although the sudden emergency doctrine developed when contributory negligence denied damages to injured plaintiffs whose own breach of care contributed to their injuries, it is not in principle uniquely or exclusively applicable to contributory negligence. Moreover, nothing in the substance of the doctrine is incompatible with the more equitable principles of comparative negligence.

319 S.W.3d at 422.[4] We warded off the same contention in *Shelton v. Kentucky Easter Seals Soc., Inc.,* with respect to the "open and obvious hazard" doctrine as it pertains to artificially-created hazards:

> The adoption of comparative negligence ... did not alter the requisite elements of a prima facie negligence claim. As a result of the holding in *Hilen v. Hays,* Kentucky became a pure comparative-fault state; but under comparative fault a plaintiff must still prove the defendant owed a duty to the plaintiff, breached that duty, and consequent injury followed. *The evolution from contributory negligence to comparative fault focused on the method in which fault is allocated but did not alter the substantive law surrounding what duties are owed by a defendant.*

413 S.W.3d 901, 906 (Ky. 2013) (emphasis added).

To reiterate: the shift to comparative fault "did not alter the substantive law surrounding what duties [exist]." *Id.* Ultimately, in *Shelton* we abrogated the "no duty" aspect of the open and obvious doctrine as it pertains to artificially-created hazards, but we did so for reasons based purely upon social policy. We did not succumb to the flawed reasoning that the "open and obvious" doctrine was based upon the theory of contributory negligence.

*Shelton* emphasized that "[t]he determination of whether a duty exists is a legal question for the court." *Id.* at 908. "[W]hether a duty of care exists is ... a purely legal question, grounded in social policy." *Id.* at 913. We found no solid social policy to sustain the open and obvious rule in the context of an indoor artificially-created hazard. However, those policy considerations have no relevance to the conditions of naturally occurring snow and ice. The social policies supporting the *Manis* rule are reviewed below; but first, an explanation to dispel the notion that the *Manis* rule is the step-child of contributory negligence.

**A.  The Manis Rule was not based upon contributory negligence and its continuing viability is not at odds with comparative fault.**

"The *Manis* rule," derived from *Standard Oil v. Manis* as well as subsequent cases including *Corbin Motor Lodge v. Combs,* 740 S.W.2d 944, 946 (Ky. 1987), and *PNC Bank, Kentucky, Inc. v. Green,*

---

**4.** It could also be said that every legal principle of Kentucky jurisprudence that existed before 1984 developed when contributory negligence was the law. That does not make those principles dependent upon or derivative of contributory negligence.

30 S.W.3d 185 (Ky. 2000), may be summarized as follows:

> An obvious and natural accumulation of snow and ice does not constitute an unreasonable risk which the landholder (a landowner, a leaseholder, tenant, or other person with control of land) has a duty to remove or warn against; however, a landholder who undertakes to mitigate the danger posed by the snow and ice assumes the duty to avoid measures that heighten or conceal the dangerous condition.

As commonly condensed, the rule provides that a landholder has *no duty* with respect to naturally-occurring accumulations of snow and ice. This "no duty" aspect of the *Manis* rule has nothing to do with the contributory negligence of the invitee. Contributory negligence has never operated to exempt a person from a duty of care. Contributory negligence did not diminish the landholder's general duty to maintain his property in a reasonably safe condition. Contributory negligence did not eliminate or reduce any *duty* at all. It simply provided that the landowner cannot be held liable for breaching his duty of care when an invitee's own negligence contributed to the injury. The difference between having no duty and having no liability for the breach of a duty is fundamental. Under contributory negligence, the landholder has no liability despite his breach of a duty; under the *Manis* rule, the landholder has no duty.[5]

The point is further illustrated by the fact that the *Manis* rule insulates the landholder from liability for injuries caused by natural accumulations of snow and ice, *even when the invitee has exercised the utmost care for his own safety and acted in the most reasonable way possible.* The *Manis* rule simply takes no account of the invitee's exercise of care. Given the universal knowledge that snow and ice left in the aftermath of a winter storm are dangerous, more often than not the vast majority of people exercise extreme caution when walking on ice, just like the injured pedestrian in *PNC Bank, Kentucky, Inc. v. Green* who complained the she "was forced to walk like she was 'walking on eggs' to avoid falling." 30 S.W.3d at 187. That is exactly what people of ordinary common sense have always done. Yet, despite the exercise of extreme caution, people get injured because snow and ice in freezing weather is a natural condition that defies human control. The *Manis* rule applies to bar tort recovery, not because the plaintiff was negligent, but because the landholder had no duty. Far from being a rationale supporting the *Manis* rule, the plaintiffs contributory negligence is immaterial under *Manis*.

To hold that the *Manis* rule is derived from contributory negligence ignores the fact that *Manis* is completely indifferent to the conduct of the invitee. Regardless of how careful or how careless the invitee may be, under *Manis*, the landholder has *no duty* to render his property safe from the risks inherent to natural accumulations of snow and ice. To the contrary, contributory negligence is totally based upon the conduct of the invitee because, regardless of the landholder's duty, it bars recovery

---

5. Other rules provide exemptions from duties of care in special circumstances. For example, a railroad landholder has no duty to maintain in any way the safety of a private rail crossing, and no duty to warn of the dangerous conditions. *See Calhoun v. CSX Transp., Inc.*, 331 S.W.3d 236, 242 (Ky. 2011). As noted in the dissenting opinion in *Calhoun*, a century of development in railroad technology, mainly the elimination of the steam locomotive, casts doubt upon the lingering wisdom of that rule. *Id.* at 248. But, we have not seen any comparable development in the technology of snow and ice removal that would warrant a change in the rule.

when the invitee's negligence, no matter how small, contributed to his injury.

Articulated nearly fifty years ago, the *Manis* rule operated concurrently with contributory negligence for only sixteen years, until 1984 when comparative fault supplanted contributory negligence. For a far longer span of time, over *thirty* years, the *Manis* rule has applied predictably, consistently, and harmoniously with comparative fault. The majority may denigrate the *Manis* rule by imputing to it a pedigree rooted in contributory negligence, but it improperly does so by inappropriately conflating the *existence of a duty* with the *apportionment of liability* resulting from the breach of a duty.

In *Shelton* and *Henson*, we recognized that comparative fault does not affect the substance of common law duties; rather, it operates within the existing regime of common law duties to allocate liability after it is determined that a duty was breached. Long ago, the Wyoming Supreme Court rejected the same claim now embraced by the majority when Wyoming's rule, equivalent to the *Manis* rule, was challenged as a vestige of contributory negligence. That court said:

> Comparative negligence only abrogated absolute defenses involving the plaintiff's own negligence in bringing about his or her injuries. However, it did not impose any new duties of care on prospective defendants. *Since the law of this state is to the effect that there is no duty to remove or warn of an obvious danger or one that is known to the plaintiff no change was accomplished in that law by the adoption of comparative negligence.*

*Sherman v. Platte County*, 642 P.2d 787, 790 (Wyo. 1982) (emphasis added) (citation omitted).

The majority speculates (see footnote 2 at the bottom of page 13) that this Court's refusal to retreat from the *Manis* rule when we decided *Corbin Motor Lodge v. Combs* in 1987 "may have been instrumental in the passage of KRS 411.182, which establishes comparative fault by statute." That is strange indeed, because if the General Assembly was roused to action by our application of the *Manis* rule in *Corbin Motor Lodge*, it could easily have expressly abrogated the *Manis* rule at the same time. As long as we're speculating, the fact that the General Assembly chose *not* to do so suggests strong legislative support *for* the *Manis* rule.

Because the legislature has not weighed in with its policy prerogative, whether the *Manis* rule is abolished or upheld remains exclusively a public policy decision for this Court to decide. A wise decision on that issue should be based upon the continuing social value found in the benefits and burdens of the rule; it should not be based upon the illusion that the rule is tainted by an association with contributory negligence or is otherwise out-of-synch with the more fashionable trends of tort law development.

**B. The Manis rule is a manifestation of sound and wise social policy; the hazard caused by naturally occurring snow and ice is not an "unreasonable" risk from which any duty arises.**

*Shelton* re-affirms that whether a duty exists is a purely legal decision that can be made by the Court as a matter of social policy. Our responsibility for the development of common law duties obliges us to be mindful of the practicalities of day to day life as we craft social policy. Our function in that regard is to establish duties, or standards of care, that deter harmful behavior and promote beneficial conduct. After great deliberation and debate, we concluded in *Shelton* that the

open and obvious doctrine as it pertained to artificial, man-made hazards, was no longer sound social policy. Some naturally occurring conditions, specifically snow and ice, present different considerations.

The overarching principle of premises liability is that "a landowner has a duty to an invitee to eliminate or warn of unreasonable risks of harm." *Shelton*, 413 S.W.3d at 914. The same duty can also be described this way: "an invitor has a duty to maintain the premises in a reasonably safe condition in anticipation of the invitee's arrival." *Id.* at 908. "Reasonableness," whether stated as an "unreasonable risk" or as a "reasonably safe condition" is the essential quality of a landholder's duty. In *Shelton*, we recognized that the reasonableness of a risk, and hence the existence of a duty, should be discerned by a jury, analyzing and weighing the benefits and burden of requiring the landholder to remove the hazard against the benefits and burden of not requiring the landholder to act. *Id.* at 918. ("There must be a weighing of the burden of eliminating the risk with the harm posed.").

Implicit in the *Shelton* calculus was our recognition that virtually every artificial hazard *can* be removed, fixed, or otherwise eliminated by the same hands that made the hazard or tolerated its presence. Loose wiring on the floor can be bundled and moved or covered with furniture; loose handrails on stairways and balconies can be secured; potholes in the parking lot can be filled; dark porches can be illuminated; broken steps, torn rugs and rotten floorboards can be repaired or replaced; asbestos can be removed or contained; grease on the pavement can be cleaned; spilled food on the grocery floor can be mopped up or roped off; a sharp curb can be reshaped.

*Shelton* calls for a balancing process by which a hazard could not be regarded as an "unreasonable risk" when the burdens of eliminating it exceeded the risk of harm created by it. As noted above, virtually all of the artificial, or man-made, hazards that have caused injury in the cases we have seen were subject to relatively simple fixes, and so the question of whether they pose an "unreasonable risk" can be readily determined. In real life, that assessment would be first undertaken by the landholder in deciding how to maintain his property. If injury and litigation ensue, under *Shelton* the jury would balance the scales and make the determination.

In sharp contrast however, the hazards of naturally-occurring accumulations of snow and ice present a fundamentally different problem. Despite all the technological advances since *Manis* was decided nearly fifty years ago, rock salt (or a similar compound) and snow shovels are still the state-of-the-art means for coping with snow and ice. And as everyone knows, they do not eliminate the hazard. Sometimes, they even make the hazard worse, as noted in *Estep v. B.F. Saul Real Estate Inv. Trust*, 843 S.W.2d 911, 914 (Ky. App. 1992) (Landholders who attempted to clear their lot and sidewalks of ice and snow assumed the duty of doing so in a reasonable manner or be liable for their failure).

The landholder generally has no better ability to protect invitees from the hazards of snow and ice on a parking lot than he does to protect them from the hazards of a parking lot inundated with flood water or from the danger of strong winds that might cross his lands. In real-life, a landholder in freezing weather can no more effectively melt the ice from his sidewalk than he can hold back the flood waters or stop the wind.

No social benefit is achieved by imposing a duty that cannot be performed. We have repeatedly reaffirmed over the past fifty years that natural accumulations of

snow and ice do not pose an "unreasonable risk" and so the landholder's duty of ordinary care does not include an obligation to eliminate the hazard. Because the risk posed by snow and ice is a *reasonable risk*, it gives rise to no duty. The risk is reasonable, or stated in the alternative, the risk is *not unreasonable*, because: 1) the danger is readily apparent; 2) the consequences to pedestrians (falling) and to motorists (wrecking) are universally understood; and 3) "the burden of eliminating the risk" is a practical impossibility. Even after the best efforts of snow and ice removal are undertaken, the danger to those who walk on it remains. This is as true now as it was in 1968 when *Manis* was decided.

The social policies informing our debate about the existence of a duty also require us to account for the ability of respective actors in the relevant arena to control the instrumentalities that inflict harm. For example, we do not impose upon a car manufacturer the duty to remove hazards from a car built by a different car maker, nor do we burden a landholder with the duty to remove hazards from his neighbor's land. The reasons are plain. To be sure, there is a measure of justice in requiring that those who cause injury must bear the burden of fixing it. But the greater reason is that to serve the social policy of reducing or eliminating the harm of injuries, the "burden of eliminating the risk" must land upon someone with enough control over the hazardous situation to fix it. With respect to snow and ice, the landholder may have control over land but he has no control over the weather. He has no way to control the snow and ice; and no way to effectively prevent it from hurting those who choose to walk upon it.

In contrast with the landholder's inability to control where the snow falls and where the ice remains, the invitee has absolute and total control of where and when he places his foot on the snow-covered ground. The injury does not occur until the invitee comes into contact with the obvious danger. The invitee has far more control over how his body will come into contact with the ice ahead of him. As noted in the preceding section, it is generally foreseeable that people walking on snow and ice exercise the utmost caution; they are not careless. But, the social policy we evaluate has nothing to do with the invitee's negligence or lack thereof. It has all to do with the ability to control the circumstances that can prevent the harm. There is great wisdom in placing the burden of the reducing the risk upon the one who has the best ability to control the risk. The *Manis* rule does that.

If our social policy is based upon the goal of reducing harmful injury, shifting the duty to the landholder by eliminating the *Manis* rule does not advance us to that goal because we would be placing the duty on one who cannot prevent the harm. The Supreme Court of Texas, a state which also operates under the *Manis* rule, noted that "the plaintiff is in a much better position to prevent injuries from ice or snow because the plaintiff can take precautions at the very moment the conditions are encountered." *See Scott & White Mem'l Hosp. v. Fair*, 310 S.W.3d 411, 414 (Tex. 2010) (quoting *Eiselein v. K–Mart, Inc.*, 868 P.2d 893, 898 (Wyo. 1994) and citing to *Manis*). This point is important because it exemplifies the social policy at work—placing the duty to reduce harm on the actor who has the best ability to control the instrumentality of harm. It has nothing to do with the putative negligence of an invitee; it has all to do with control of the circumstances leading to the injury, which are inherently retained by the invitee.

The Supreme Court of Ohio has also rejected efforts to abrogate its articulation of the *Manis* rule:

> Recognizing [the inherent dangers of winter weather] we have previously rejected the notion that a landowner owes a duty to the general public to remove natural accumulations of ice and snow from public sidewalks which abut the landowner's premises, even where a city ordinance requires the landowner to keep the sidewalks free of ice and snow.... [W]e are unwilling to extend homeowner liability to cover slip-and-fall occurrences caused entirely by natural accumulations of ice and snow. To hold otherwise would subject Ohio homeowners to the perpetual threat of (seasonal) civil liability any time a visitor sets foot on the premises, whether the visitor is a friend, a door-to-door salesman or politician, or even the local "welcome wagon."

*Brinkman v. Ross*, 68 Ohio St.3d 82, 623 N.E.2d 1175, 1177–78 (Oh. 1993).

The Illinois Supreme Court retains the same rule, holding in *Krywin v. Chicago Transit Auth.*, 238 Ill.2d 215, 345 Ill.Dec. 1, 938 N.E.2d 440, 450 (Il. 2010):

> [T]he natural accumulation rule applies in this case and [the landholder] had no duty to remove the natural accumulation of ice and snow from its platform, nor any duty to warn of the existence of such natural accumulation. As there was no evidence that the ice on the platform where plaintiff fell was anything other than a natural accumulation[.]

Other states retaining the "no duty" rule for natural accumulations of snow and ice include North Dakota (*see Fast v. State*, 680 N.W.2d 265, 270 (N.D. 2004)) ("We need not decide whether the snow and ice accumulation in this case was natural or artificial because, given the climate in North Dakota, it would be unreasonable and unduly burdensome to hold the State liable without some further act or omission on its part creating an unreasonably dangerous condition.") and Wyoming. *See Eiselein v. K–Mart, Inc.*, 868 P.2d 893, 895 (Wyo. 1994) ("[T]his court has adopted the rule that an owner or occupier of a premises will not be liable for injuries resulting from a slip and fall on a natural accumulation of ice or snow."). However, we should not need a state-by-state survey to know the best policy for Kentucky. Given the fundamental differences between artificially-created hazards and the natural accumulation of snow and ice, and considering the social policies inherent to exercising our responsibility over the common law doctrine, I respectfully suggest that neither justice nor the people of Kentucky will be well-served by abrogating the *Manis* rule. The majority errs in doing so.

It is suggested that eliminating the *Manis* rule will encourage landholders to be pro-active in clearing their land of snow and ice. Common experience refutes that assumption, especially as it relates to business property. It is well-known that when a winter storm hits Kentucky, after a brief flurry to secure basic commodities, commerce comes to a virtual standstill as drivers are warned to stay off the roads. Businesses strive to make their properties as inviting as possible to employees and customers, working diligently to clear what can be cleared. Common everyday experience confirms that the *Manis* rule does not overcome the landholder's fundamental incentive to make property safe and attractive for invitees. There is certainly no evidence to suggest that doing away with the rule will promote the social policy of making property safer.

It is also worth noting that elimination of the *Manis* rule will have its harshest effect on residential landholders, especially

those who lack the means and resources to attack the hazard that nature has dropped upon their land. Until now, homeowners and renters have had no duty to remove the snow that fell and the ice that formed upon their sidewalks and driveways. From now on, they will be obligated to brave the elements, risking injury to themselves in a futile attempt to eliminate the defects that can only be truly "repaired" by warmer air and sunshine, which fortunately in Kentucky is usually only a few hours away, and rarely is it more than a day away. I fail to see the social advantages of the policy imposing that duty. We could as well impose a duty upon owners of outdoor swimming pools to protect invitees from the harmful ultraviolet rays of the sun, and one could reasonably construe the majority opinion as now imposing that very duty.

Under the majority opinion, the "burden" of snow and ice removal now placed upon the residential landholder might be ameliorated by the jury sorting out the inequities with a finding that the residential landholder has satisfied his duty to take "reasonable" measures if he has done no more than what his particular circumstances permit him to do. But then, we have one duty for the rich and another duty for the poor; one for the hearty and healthy landholder who can shovel snow and another one for the frail and disabled. Attorneys, judges, and juries alike must now bend the assessment of what is "reasonable" to accommodate the particular circumstances of the landholder, essentially reflecting a social policy that says the poor man's invitee is due less protection than invitees of the wealthy. Shoppers at stores operated by large wealthy corporations, such as Walmart, would be entitled to greater protections than those shopping at corner grocery stores in poor neighborhoods. We do not allow for such distinctions based upon wealth and status when assessing what duties a driver on the highway must observe, but we do so now with respect to premises liability. The majority's new rule opens the door to vast realms of new issues to litigate and it solves nothing. It is a new rule for the sake of having a new rule, and a solution in search of a problem.

The *Manis* rule is fair because it leaves all participants on equal footing. When confronted with naturally-occurring snow and ice, landholders and pedestrians alike must decide for themselves what risks they will take and what responsibilities they will assume. Each conforms his conduct to his own expectations, abilities, and needs. I fail to see the social advantages of abolishing that policy. The *Manis* rule is a valuable social policy now being discarded by this Court because the majority mistakenly assumes that despite the thirty years of practice to the contrary, the policy is no longer compatible with comparative negligence.

## C. The trial court correctly granted summary judgment.

Appellant argues that even under the *Manis* rule, summary judgment would be improper because genuine issues of material fact remain in dispute. He identifies those facts as follows: 1) Was the ice upon which he fell a naturally-occurring accumulation or had it been transferred there by some other, presumably artificial, means? 2) Could Appellant have foreseen that a dangerous patch of ice would accumulate under the Holiday Inn carport? 3) Did the Holiday Inn undertake to remove the ice, thereby voluntarily assuming a duty not otherwise imposed by the law? And, 4) Was Appellant forced to encounter the hazard by the lack of another means to exit?

Appellant is correct that if any of these questions were answered to his advantage, the *Manis* rule would not act as a bar to his recovery. The trial court correctly determined that there was no genuine dispute about those facts. First, Appellant offered no evidence indicating that the source of the ice was anything other than a naturally-occurring accumulation. Appellant fell at 6:30 AM on a freezing February morning following a winter storm that dropped four inches of snow and ice overnight. The fall occurred in a carport with three sides open to the wind-driven snow. There is speculation and conjecture about it, but no evidence to support any finding other than the most obvious conclusion—the ice was the natural result of the preceding storm.

Second, Appellant's lack of foreseeability argument is based upon his claim that he "had the right to believe the covered walkway (the carport under which he fell) was free from potential hazards" because the Holiday Inn's night manager should have known about the snow and ice under the carport. Appellant's ability or inability to foresee the danger is not a material fact. Even if it was, having a "right" to a hazard-free passway does not eliminate the foreseeability of hazardous ice following a major winter storm that only a few hours earlier had forced Appellant off the interstate highway in search of shelter.

Third, Appellant is correct that under *PNC Bank v. Green, supra,* Holiday Inn had a duty to avoid making things worse, converting a natural hazard into a man-made one. The evidence offered by Appellant to sustain that contention is the fact that the Holiday Inn had a snow removal plan which had not yet been effectuated at the time of his injury. Failing to initiate action when one has no obligation to do so is far different from taking actions that aggravate an already bad situation. Obviously, the Holiday Inn's failure to act sooner did not aggravate the natural condition that Appellant confronted when he left the building.

Finally, there is no evidence that Appellant was forced to leave the Holiday Inn at 6:30 in the morning before sunrise. He offered no evidence that he was forced to depart because of a check-out time imposed by the Holiday Inn, that he had overstayed his welcome, or was otherwise compelled to evacuate. This is not a case in which an invitee claims he was constructively trapped by the landholder's failure to address the hazard for an inordinate amount of time. This injury occurred before daylight a few hours after the snowfall. Here, there was even uncertainty about whether the storm was over. The urgency in Appellant's departure, was at his own behest. There is no suggestion that it was forced upon him. For these reasons, I agree with the trial court and the Court of Appeals that summary judgment was an entirely appropriate disposition of this unfortunate event.

In conclusion, I respectfully submit that the majority is wrong in its assumption that the *Manis* rule must be abolished because it is based upon contributory negligence. The premise upon which the majority opinion is based is flawed. The social policy adopted by the majority, imposing a duty upon landholders to eliminate the dangers of natural accumulations of snow and ice is an unwise departure from a sound, beneficial common law principle.

I would affirm the decisions of the trial court and the Court of Appeals. Therefore, I dissent.

Abramson and Cunningham, JJ., join.