MODIFIED: AUGUST 24, 2017
RENDERED: MARCH 23, 2017
TO BE PUBLISHED

$\mathfrak{Supreme\ Court\ of\ Kentucky}$

FINAL

2014-SC-000641-DG

DATE 824/17 Kim Redman, DC

TERESA GRUBB AND
RANDY GRUBB

APPELLANTS

V.

ON REVIEW FROM COURT OF APPEALS
CASE NO. 2011-CA-000223-MR
CLAY CIRCUIT COURT NO. 08-CI-00033

ROXANNE SMITH
AND
SPEEDWAY SUPERAMERICA LLC

APPELLEES

**OPINION OF THE COURT BY JUSTICE HUGHES**

**REVERSING AND REMANDING**

This case has had a long procedural history, including two attempted removals to federal court, two trips to the Court of Appeals, and now a second visit to this Court, but it began life as, and remains, a fairly straightforward personal injury suit arising from a February 1, 2007 trip-and-fall at the Speedway SuperAmerica filling-station in Manchester, Kentucky. In the ensuing 2010 bench trial, the Clay Circuit Court found for Plaintiffs, Teresa Grubb and her husband Randy Grubb, and against Speedway SuperAmerica LLC (Speedway), the store's owner, and Roxanne Smith, the store's manager at the time of the accident (collectively "Defendants"). The trial court awarded the

Grubbs some $200,000 damages, including an award of $175,000 to Teresa for pain and suffering.

On appeal, the Court of Appeals, invoking the common-law's open and obvious doctrine, reversed and remanded for entry of a defense judgment. This Court granted the Grubbs' motion for discretionary review. Noting our then recent attempts (in such cases as *Kentucky River Med. Ctr. v. McIntosh*, 319 S.W.3d 385 (Ky. 2010); *Dick's Sporting Goods v. Webb*, 413 S.W.3d 891 (Ky. 2013); and *Shelton v. Kentucky Easter Seals Soc. Inc.*, 413 S.W.3d 901 (Ky. 2013)) to modernize the open and obvious doctrine and to harmonize it with our tort law's shift to a regime of comparative negligence, we remanded to the Court of Appeals for reconsideration in light of our recent precedent. On remand, the Court of Appeals panel found its prior ruling consistent with our recent cases and so stood by its original determination that the Grubbs' claims failed in their entirety.

We again granted the Grubbs' motion for discretionary review, and because we agree with them that the Court of Appeals panel read *McIntosh* and its progeny too narrowly, we reverse the panel's ruling. Our reversal reopens certain issues the panel's ruling rendered moot. Ordinarily, we would remand the matter to the Court of Appeals for its consideration in the first instance of those now resurrected issues. Given the long delays the parties have already endured and the fact that those issues have been briefed by the parties, however, we depart from our usual practice and address additional issues concerning the liability of store manager Roxanne Smith, the comparative fault

2

of Teresa Grubb, and the trial judge's denial of a post-judgment motion to recuse. The upshot is our conclusion that the trial court erred by failing to consider whether Teresa Grubb shared responsibility for the accident, and, in light of certain undisputed facts, by failing to find that she did. We further conclude that the trial court erred in finding Smith jointly and severally liable with Speedway on the Grubbs' claims. Finally, we affirm the trial court's denial of the twelfth-hour recusal motion. Accordingly, we reverse and remand this case for further proceedings consistent with our Opinion.

## RELEVANT FACTS

According to several witnesses at trial, including Teresa, at about 8:30 p.m. on February 1, 2007, she exited the convenience-store portion of the Speedway filling station in Manchester and was walking back to her car after she and a friend had paid for gasoline and purchased beverages. Teresa caught her foot in an eroded patch of asphalt in the middle of the driveway between the station's two parallel gas-pump islands and fell. The fall resulted in a broken ankle, a wrenched knee, and burns from the hot coffee Teresa had just purchased.

Teresa's testimony, the testimony of eye witnesses to the accident, and the testimony of Teresa's husband all tended to establish that Teresa experienced significant pain at the time of the accident and during its immediate aftermath. Teresa and her husband testified that then and continuing through the early stages of her recuperation, Teresa was to a large extent incapacitated and was forced to rely heavily on her husband for personal

3

assistance and for household maintenance. And even after her ankle had healed (which her physician testified occurred within a year of the accident), Teresa continued to experience discomfort when she walked and swelling in her ankle if she stayed on her feet for extended periods. She testified that she was no longer able to wear high-heels, to go dancing, or to ride recreational vehicles, something she and her husband had enjoyed doing together. Her physician testified that those residual consequences of the injury could well prove permanent. Hospital, physician, and pharmacy records established that Teresa incurred medical expenses of slightly less than $5,800.

For these losses—the expenses incurred, Teresa's pain and suffering, her lost abilities and enjoyments, and her husband's lost consortium—the Grubbs sought $2 million from Speedway and its store manager Smith. According to the Grubbs, by opening the premises for business purposes Defendants incurred duties to ensure that the premises were reasonably safe for business invitees such as Teresa. Defendants had breached those duties, the Grubbs maintained, by failing to fix in a timely manner the eroded asphalt that tripped Teresa up.

Smith testified that she began working at the Manchester store in October 2004 and was promoted to manager in October 2006, some three or four months prior to Teresa's accident. Smith acknowledged that her employment duties included inspecting, at regular intervals, the store's exterior premises; policing them for trash and rubbish; sweeping the walkways; and reporting to the "store support" office, *via* an email, any "large cracks and

potholes" in the gas-pump and parking areas. "Store support," according to Smith, was responsible for referring such reports to a repair person. Smith also acknowledged that she had a budget of up to $100 per day for such immediate necessities as "replacing a burned out light bulb," but she denied having the authority, much less the responsibility, either to make driveway repairs on her own or to contact a repair person directly without going through "store support." Smith further testified that while she was familiar with the worn patch of asphalt by the drain—she saw it at least once every day, every time she emptied out a bucket of mop water—she had not reported it to "store support," because in her view it was not hazardous, not the sort of "large crack [or] pothole" Speedway wanted her to report.

Other employees testified similarly. They knew from emptying mop buckets that the asphalt by the drain had worn, but the worn patch did not strike them as hazardous. Employee testimony also tended to establish that the drain area was well lit in the evenings; was not obscured by cars parked at the gas pumps; and, although there was, because of the pumps, heavy pedestrian traffic in that area, the worn asphalt had not caused any other customer to trip or even to complain.

Photographs introduced by both sides showed that the driveway area directly between the two pump islands was surfaced with concrete, and, as noted, testimony indicated that that area was also canopied and lighted. Beyond the concreted area between the islands, the driveway/parking portion of the premises was surfaced with asphalt. The drain was located about

5

midway between the pump islands and toward one end of the concrete portion of the drive. It was set into the drive so that its cover was flush with the surface of the concrete. One side of the drain lay near the concrete/asphalt boundary, and it was there, the photo exhibits show, near that side of the drain, that an irregularly shaped patch of the asphalt—a foot square, perhaps, more or less—had weathered and eroded. The erosion varied from just a fraction of an inch to what appears to be, in a small area, at least two inches and probably more. One photograph shows erosion through the top layer of asphalt to a second or even third layer below.

Defendants maintained that they had no duty to do anything about this asphalt area because it was in plain view—"open"—and the risk it posed to pedestrians, such as it was, was apparent—"obvious." Under the common law's "open and obvious" doctrine, they argued, such conditions do not pose an "unreasonable" risk of injury to business invitees—the invitees being well able to protect themselves from such risks—and thus do not conflict with the premises owner's duty to ensure that the premises are "reasonably" safe. Smith maintained, additionally, that her limited employment duties as store manager did not subject her to liability to the Grubbs.

The trial court, the finder-of-fact in this bench trial, rejected Defendants' characterization of the area where Teresa Grubb fell. In its view, as expressed in the "Findings" portion of its Judgment, the photo exhibits showed a significant tripping hazard, a "hole" which Defendants should have realized might go unnoticed by an invitee. The court found that the hole rendered the

6

premises unreasonably unsafe and thus triggered Defendants' duty to mitigate the risk. Their failure to do so constituted a breach of their duty, according to the court, and that breach caused injuries to Teresa and her husband, including what the trial court deemed Teresa's "significant and prolonged" pain and suffering.

In the "Conclusions" portion of its initial Judgment, the trial court held that Speedway was vicariously liable for the "acts and/or failure to act on the part of its employees, Roxanne Smith, et al., under the Doctrine of Respondeat Superior." The court also held that Speedway's liability rendered moot "the individual claim against Roxanne Smith." In a Kentucky Rule of Civil Procedure [CR] 59.05 motion to alter or amend, Speedway (without, it appears, acknowledging a potential conflict with Smith) objected to the apparent inconsistency of finding it vicariously liable for Smith's actions when her direct liability would never be conclusively determined.

Following the motion, the trial court amended its Judgment to find that Smith's duty to inspect, sweep, and remove trash from the premises together with her $100/day necessities budget "constituted a level of supervision and control of the premises that created on the part of the Defendant, Roxanne Smith, the legal duty of a possessor of the property in question to business invitees." The court further found that Smith breached that duty and she was jointly and severally liable for the $200,762 in damages awarded to the Grubbs.

7

At the same time that Speedway filed its motion to alter or amend, Speedway and Smith filed a motion "for recusal and a new trial." Defendants moved the trial judge, Judge Oscar House, to order a new trial and to recuse. The recusal motion was premised on allegations aired (after the trial in this case) in the course of a criminal trial in the United States District Court for the Eastern District of Kentucky. According to Defendants, those allegations linked Judge House and the Grubbs' attorney, Yancey White, to a Clay County, Kentucky vote-buying conspiracy, which in turn lent an air of impropriety to Judge House's ruling on a matter of direct interest to Mr. White. Defendants maintained that the relationship suggested in the federal case "between Judge House and Mr. White calls into question the rulings received by these Defendants and other parties in similar circumstances."

Denying that motion, Judge House opined that the unsupported allegations mentioned during the federal trial did not amount to the sort of substantial evidence of impropriety or bias that justifies or requires recusal. Furthermore, Judge House noted that while the federal court allegations were aired in March 2010 (after the January 2010 trial in this case), Defendants waited until after entry of the August 9, 2010 Judgment to raise their concerns. In the judge's view, Defendants' "failure to bring the matter to the Court's attention in a timely fashion" amounted to a waiver of whatever right to complain they may have had.

On appeal to the Court of Appeals, Defendants challenged the trial court's application of the "open and obvious" doctrine and they sought review

8

regarding Smith's individual liability, Teresa Grubb's comparative fault, and Judge House's refusal to recuse. While acknowledging it was dicta, the appellate panel deemed clearly erroneous the trial court's conclusion that Smith's employment duties were such that she could be held liable to business invitees in the same manner as the premises owner. The Court of Appeals' main ruling was that the trial court had erred by failing to apply the "open and obvious" rule to the clearly visible parking-lot imperfection at issue. In their view, the imperfection was of a type so common and so universally anticipated and observed by invitees that it could not, absent some exceptional circumstance, give rise to the premises owner's liability.

The panel noted that since the entry of the trial court's Judgment, this Court had rendered its Opinion in *McIntosh, supra,*[1] and it acknowledged that *McIntosh* recognized an exception to the open and obvious rule for cases in which, notwithstanding the hazard's obviousness, the possessor of the premises could reasonably foresee that an invitee would fail to avoid it. In the panel's view, this exception was meant to be a narrow one, limited to situations where "it was foreseeable that the plaintiff would be distracted and not observe or appreciate the danger." There being no evidence in this case of a distraction or of any other exceptional circumstance, the panel concluded that the

---

[1] In *McIntosh,* we affirmed a judgment in a favor of a paramedic who was injured when she tripped over a curb while helping to transport an injured person from an ambulance into a hospital's emergency room. 319 S.W.3d at 387. Our attempt to explain why the "openness" and "obviousness" of the curb did not defeat the plaintiff's claim launched what has become an on-going discussion of the effect the adoption of comparative negligence has had on contributory-negligence-related rules such as the old "open and obvious" rule.

9

*McIntosh* exception did not apply and that under the common-law rule Defendants were entitled to judgment as a matter of law.

We granted the Grubbs' discretionary review motion, vacated the Court of Appeals' Opinion, and remanded the matter to that court for reconsideration in light of two cases subsequent to *McIntosh*, namely *Dick's Sporting Goods v. Webb*, 413 S.W.3d at 891, and *Shelton v. Kentucky Easter Seals Soc. Inc.*, 413 S.W.3d at 901.[2] As noted in those Opinions, both are attempts to refine and to clarify *McIntosh* and further to explore and to articulate, in the context of premises liability and the "open and obvious" rule, the seismic effects of Kentucky's shift to comparative fault. Specifically, *Hilen v. Hays*, 673 S.W.2d 713 (Ky. 1984) and KRS 411.182 embody Kentucky tort law's version of the now virtually universal shift from the old common law's complete defense of contributory negligence, in its many guises, toward a new regime in which a plaintiff's own negligence no longer bars his or her claim.

Under the comparative-fault regime, the fact finder is tasked with apportioning fault for the plaintiff's injuries between (or among) those responsible, with the defendant's liability for the plaintiff's damages proportionate to his or her share of the fault. The new system is designed to

---

[2] In *Dick's Sporting Goods*, the plaintiff, a customer, slipped and fell on a wet floor just inside a retail store's main entrance. The trial court granted summary judgment to the defendant under the "open and obvious" rule. Upholding the Court of Appeals' reversal of the summary judgment, we sought to delineate the boundaries of the "open and obvious" rule, which, we held, did not apply to the hazard in that case. In *Shelton*, the wife of a hospital patient tripped and fell over wires along her husband's bedside. The hospital was granted summary judgment under the "open and obvious" rule. Reversing, we sought to clarify why, in accord with the principles discussed in *McIntosh*, the "open and obvious" rule did not preclude recovery.

10

protect defendants, including premises-liability defendants, from being saddled with liability for the plaintiff's own negligence and thus greatly reduces (theoretically, at least) the need for common law rules designed to limit the land possessor's duties of care toward the particular plaintiff. To the extent that those old rules survive, as the Court's discussion in *McIntosh, Dick's Sporting Goods,* and *Shelton* indicates, their application needs to be reassessed and made to harmonize with the new comparative-fault system.[3] Emphasizing the new system's heavy reliance on jury (or fact-finding judge) apportionment of fault, *McIntosh* and its progeny strongly counseled courts, trial and appellate, not to short circuit premises liability cases by easy resort to the old-school type of "no duty" ruling. Such rulings should henceforth be reserved, rather, for

---

[3] Academic debate about the "duty" element in negligence law following the shift to comparative fault has been both voluminous and intense, frequently characterized as the "duty wars." See Alani Golanski, *A New Look At Duty In Tort Law: Rehabilitating Foreseeability And Related Themes,* 75 Alb. L. Rev. 227 (2011-2012) (noting W. Jonathan Cardi & Michael D. Green's use of that phrase in, *Duty Wars,* 81 S. Cal. L. Rev. 671 (2008), and attempting to identify the "wars" principal battle lines and some of its representative combatants); see also John C. P. Goldberg and Benjamin C. Zipursky, *Civil Recourse Defended: A Reply To Posner, Calabresi, Rustad, Chamallas, And Robinette,* 88 Ind. L.J. 569 (2013) (an account of the "wars" from the point of view of two of the major participants). As our recent spate of premises liability cases makes clear, we are painfully aware of these "wars" by virtue of being caught up in them. Unlike the theorists and commentators, however, who can assume the lofty perspective of generals high above the battlefield, we must chart our course into the brave new post-*Hilen* world one case at a time. The scholarship is helpful, of course, but any use we make of it (this includes any citations to the *Restatement (Third) of Torts,* which many see as having abandoned to a significant degree the descriptive aims of earlier editions for a role as advocate) should not be understood, absent an express statement to the contrary, as adopting or endorsing any one or another of the contending theories. See, Victor E. Schwartz and Christopher E. Appel, *Reshaping The Traditional Limits Of Affirmative Duties Under The Third Restatement Of Torts,* 44 J. Marshall L. Rev. 319 (2011)).

11

classes of cases genuinely implicating public policy concerns of sufficient weight to justify an exception to the basic premises liability rules.

Notwithstanding those exhortations, on remand the Court of Appeals panel did not read *Dick's Sporting Goods* or *Shelton* as extending what it viewed as *McIntosh's* narrow exception to the very alive-and-well open and obvious doctrine. Having already determined that the *McIntosh* exception did not rescue the Grubbs' claims, the panel readily concluded that *Dick's Sporting Goods* and *Shelton* did not rescue them either.[4] Reinstating its prior order, the appellate court again reversed the trial court's Judgment and remanded the matter for entry of a judgment dismissing the Grubbs' claims.

On this second discretionary review, the Grubbs insist that the Court of Appeals' application of the "old style" open and obvious doctrine misses the point of *McIntosh* and its progeny, and amounted in this case to appellate usurpation of the trial court's fact-finding role. Our analysis begins with consideration of these claims.

## ANALYSIS

### I. Speedway and Smith Were Not Entitled to a Directed Verdict Under The Open and Obvious Rule.

---

[4] In a bow, apparently, to *Shelton's* cautioning against "no duty" rulings in "open and obvious" cases, the Court of Appeals slightly reworded its ruling. It again insisted that the pothole at issue did not pose an unreasonable risk of injury, but now, instead of holding that the pothole did not implicate Defendants' duty to maintain reasonably safe premises, it held that their failure to fix the pothole could not be found a breach of that duty. Nevertheless, in either version, the crux of the panel's view was that the particular hazard was not "unreasonable" because only a negligent invitee would be injured by it. In effect, they held recovery was barred because the plaintiff was (had to have been) negligent—the old contributory negligence bar—precisely the outcome *McIntosh* and *Shelton* sought to correct.

12

To begin at the beginning, this is a premises liability case involving the long-recognized subclass of "business premises" and the duties a possessor of such premises owes to "business invitees." In *Shelton*, we noted that in Kentucky the general rule in such cases is, and has long been, that "a possessor of land owes a duty to an invitee to discover unreasonably dangerous conditions on the land and either eliminate or warn of them." 413 S.W.3d at 909 (citing *McIntosh*, 319 S.W.3d at 388). Conversely, conditions on the land that are not unreasonably dangerous do not implicate the land possessor's duty of care, and thus injuries arising from such conditions cannot give rise to the possessor's liability. The *Restatement (Second) of Torts*, § 343 (1965). The main questions before us, then, are whether the asphalt area where Teresa tripped did or did not amount to an unreasonably dangerous condition, and who gets to make that determination.[5]

Under the old common law, the rule developed that conditions on the land could not be deemed unreasonably dangerous if they were "known to the visitor or so obvious to him that he may be expected to discover them." *Bonn v. Sears, Roebuck & Co.*, 440 S.W.2d 526, 528 (Ky. 1969). "Obvious," for these purposes, meant "that both the condition and the risk are apparent to and would be recognized by a reasonable man in the position of the visitor

---

[5] The Grubbs initially posit that the Court of Appeals' decision should be reversed because the appeals panel addressed an issue that had not been properly preserved. Because we agree with the Grubbs that the appeals panel's decision must be reversed, although for a different reason, we decline to discuss the preservation issue at this point. It resurfaces below, however, when we turn to issues we resolve adversely to the Grubbs.

13

exercising ordinary perception, intelligence and judgment." *Bonn*, 440 S.W.2d at 529. Such "obvious" risks could not be deemed unreasonable because the invitee could be expected to protect him or herself from them. Indeed, many of the early cases reiterate that invitees *should* be expected to protect themselves, otherwise the land possessor would become an insurer of their safety. *See, e.g., Humbert v. Audubon Country Club*, 313 S.W.2d 405 (Ky. 1958) (citing *J.C. Penney Co. v. Mayes*, 255 S.W.2d 639, 643 (1952)).

As we discussed in *McIntosh*, this "open and obvious" rule, while not necessarily derived from the more general contributory negligence rule, has obvious affinities to it, as several old cases make clear by often referring to both in the same breath. The open and obvious rule came to be applied in much the same way as contributory negligence: as a rule of law whereby courts, by labeling a condition on the property "obvious," in effect precluded jury consideration of the condition's reasonableness. That, as our recent cases have tried to make clear, is a problem.

From *United States v. Carroll Towing Co.*, 159 F.2d 169 (2nd Cir. 1947) to the *Restatement (Third) of Torts: Phys. & Emot. Harm* (2010) (See section 3, Negligence), it has been widely understood that the reasonableness of a risk involves some manner of balancing the costs or burdens of mitigating it against the likelihood and severity of the injuries it threatens. In our law, that determination, that balancing is ordinarily deemed a matter of fact to be addressed by the jury. *Shelton*, 413 S.W.3d at 914; see also *Restatement (Third) of Torts: Phys. & Emot. Harm*, § 8, Judge and Jury (2010). As *McIntosh*

14

and *Shelton* explained, however, application of the "open and obvious" rule tends to frustrate that intended jury function.

As we further discussed in *McIntosh*, the gradual demise of contributory negligence as a complete defense in favor of the comparative fault approach to protecting defendants from liability for the plaintiff's negligence, as well as the *Restatement (Second) of Torts'* important observation that the "open and obvious" rule has significant qualifications[6] made, or should have made, the determination of whether an "obvious" risk-posing condition on the land was reasonable or not very fact dependent again. Consequently, this shift should have restored the jury's principal role in making that factual determination.

Our *McIntosh* line of cases, including *Dick's Sporting Goods, Shelton,* and now *Carter v. Bullitt Host, LLC,* 471 S.W.3d 288 (Ky. 2015), reflect our determined effort to effect that restoration and to limit holdings, at trial or on appeal, that an obvious, risk-posing condition on the property is "not unreasonable as a matter of law," to those rare instances where they are justified. For example, public policy may require that a frequently recurring type of risk-creating condition be deemed not unreasonable and thus excepted from a land possessor's general duty of care.[7] Similarly, in some, *albeit* rare,

---

[6] Under § 343A of that *Restatement*, the land possessor is not subject to liability for obvious conditions "unless the possessor should anticipate the harm despite such . . . obviousness."

[7] *See Shelton,* 413 S.W.3d, at 908 (citing *Pathways, Inc. v. Hammons,* 113 S.W.3d 85, 89 (2003) for the idea that the duty determination is a policy question addressed by the court as a matter of law and is appropriate only where the determination will apply to a category of cases); and *see, e.g., Standard Oil Co. v. Manis,* 433 S.W.2d 856 (Ky. 1968) (holding that land possessors have no duty to mitigate the risks posed by natural accumulations of ice and snow), and Justice

instances summary judgment or a directed verdict is appropriate because "the plaintiff's conduct in the face of an open and obvious hazard [was] . . . clearly the only fault [sic] of his injury . . . [as] for example when a situation [a risk-creating condition on the property] cannot be corrected by any means or when it is beyond dispute that the landowner had done all that was reasonable." *Carter*, 471 S.W.3d at 297 (citing generally *Shelton*, 413 S.W.3d at 911-918).[8]

If *McIntosh* and its earlier progeny left any doubt about our intention to return most open and obvious cases to jury consideration, the majority's Opinion in *Carter* should lay all such doubts to rest. As the *Carter* Court held, "all open and obvious hazard cases, including obvious natural outdoor hazard cases, are subject to the comparative fault doctrine." 471 S.W.3d at 289-90. Since here, in our view, the Court of Appeals panel clearly violated that "doctrine," by substituting its view of reasonably debatable facts for that of the fact-finder, we must reverse its decision.

In concluding that Defendants were entitled to judgment as a matter of law, the Court of Appeals panel suggests that this case involves either or both of the exceptions noted above, *i.e.*, either no rational fact-finder could deem Teresa's injuries the result of anything but her own fault, or, as a general matter of public policy, small, "everyday" paving flaws such as the one at issue

---

Venters's cogent defense of that decision in his Opinion dissenting from the Court's recent decision in *Carter*, which overruled *Manis*.

[8] *See, e.g., Bonn, supra,* where, in light of the proven circumstances, the plaintiff's negligent failure to observe an automobile service center's grease pit, into which he fell, was deemed the only pertinent cause a reasonable juror could assign to his injuries.

16

should not be deemed unreasonably dangerous. With respect to the panel's first concern, it notes that the risk-creating condition in this case, the "hole" as the trial court labeled it, was indeed obvious. There was no dispute that it was in plain view in a well-lit area. Further, Teresa admitted that she failed to observe the hazard, not because it was obscured or because she was distracted, but simply because she was talking to her friend and not paying attention to where she was walking.[9] Citing *City of Mayfield v. Hamlet*, 227 Ky. 758, 13 S.W.2d 1051 (1928), which also involved a trip occasioned by a paving defect, the panel opined that Speedway was not obliged to anticipate that one of its invitees "would blindly walk through its parking lot oblivious to common imperfections," the imperfection in this case being "only a danger to the unwary." As their reliance on this old contributory negligence case might suggest, the Court of Appeals' ruling misses the comparative-fault point we have labored to make since *McIntosh*.

To be sure, "[t]here is in general no duty to anticipate and take precautions against the negligence of another person." *Davis v. Consolidated Rail Corp.*, 788 F.2d 1260, 1265 (7th Cir. 1986). *Davis* involved the negligence claims of a railroad inspector (Davis) whose legs were severed when the train, one of the cars of which he was inspecting, began moving without any warning. Davis was himself concededly negligent, because he failed to post the blue warning flags custom and regulation required when a train inspector

---

[9] During Teresa's direct examination her counsel asked, "Did you notice the hole?" Teresa answered, "No, I wasn't looking at the ground or anything."

17

undertook his duties. In resisting Davis's claim that it could be deemed negligent for not giving any warning prior to moving the train, the railroad company cited the general rule just noted to the effect that it had no duty to anticipate Davis's breach of his own duty to look after himself. The Seventh Circuit Court of Appeals acknowledged the general rule, but explained an important caveat.

The Court noted that in jurisdictions, such as the one where Davis's injury occurred, "where the complete defense of contributory negligence has given way to the partial defense of comparative negligence," if "precautions necessary to prevent an undue risk of injury to persons who are exercising due care are omitted and a careless person is injured as a result, then . . . the careless victim can recover some damages. But he can do so, in general, only if there was a breach of duty to the careful." *Id.*

Here, of course, the Court of Appeals asserted that Speedway breached no duty to the careful, since the pothole "was a danger only to the unwary." We disagree. Teresa did not fall into a grease pit. *See Bonn,* 440 S.W.2d at 527. As emphasized in *McIntosh* and its progeny, an obvious risk-posing condition on the property can be unreasonable if, despite the obviousness, the property possessor can still anticipate someone's being injured by it. While there was no serious dispute that the "hole" here was "obvious," for these

18

purposes,[10] neither was there any dispute that it was located in an area—the driveway directly between gas-pump islands—heavily trafficked by both pedestrians and automobiles. A reasonable fact-finder could readily have believed that Speedway could and should have anticipated a duly cautious pedestrian's being distracted momentarily by a moving car or blinded momentarily by a car's headlights so as to encounter the pothole notwithstanding its obviousness. Under the comparative fault doctrine, since Speedway could reasonably be thought to have breached its duty to the careful, Teresa's claim remained viable even though by her own admission she was careless.[11]

The Court of Appeals, citing *Lugo v. Ameritech Corp. Inc.*, 629 N.W.2d 384, 389 (Mich. 2001), another "pothole" case, also suggested that because potholes and other minor flaws in walkways are so common, pedestrians should anticipate them and those minor flaws should be deemed, as a matter of law, not to pose an unreasonable risk of injury. Along these lines, a number of jurisdictions have adopted so-called trivial-defect rules, under which pavement flaws satisfying some standard of minimalness are deemed not

---

[10] The Grubbs' arguments to the effect that the pothole was not "obvious" because the defense witnesses testified that the pothole did not seem to them hazardous does little to address the genuine issues.

[11] We note again that, land-possessor (and lower-court) concerns to the contrary notwithstanding, comparative negligence is not intended to, and does not in fact, render land possessors the insurers of negligent invitees. Negligent invitees still are not entitled to recover for their own negligence. The difference under comparative fault, as we noted in *Carter*, is only "that a landowner is not excused from *his own* reasonable obligations just because a plaintiff has failed to a degree, however slight, in looking out for his own safety." 471 S.W.3d at 298 (emphasis supplied).

19

unreasonable.[12] The rationale for such rules, generally, is that, because there is no such thing as a flawless pavement, to impose a requirement on land possessors to address minor flaws "would be to place upon them too great a financial burden." *Elstun v. Spangles, Inc.*, 217 P.3d 450, 454 (Kan. 2009).[13]

Kentucky has not adopted a "trivial defect" rule, but in *Shelton*, as Defendants point out, the Court noted that risks posed by obvious conditions on the premises will sometimes, absent countervailing circumstances, not be unreasonable. Such a risk "is not unreasonable," we observed, "if a reasonable person in the defendant's shoes would not take action to minimize or avoid the risk.'" 413 S.W.3d at 914 (quoting Dobbs, *The Law of Torts* § 143, p. 335 (2001)). One of the examples the Court gave of an open and obvious condition that might pose only a reasonable risk was "a small pothole in the parking lot of a shopping mall." *Id.* Speedway urges us, in effect, to fashion from this example a trivial defect rule under which all "small potholes," at least all "obvious" ones (such as the hole in this case) are deemed "not

_____

[12] The Ohio courts, for example, apply a "two-inch rule" to walkway defects. They presume, although the presumption is rebuttable, that any flaw less than two-inches deep does not pose an unreasonable risk of harm. *Long v. Speedway, LLC*, 2016 WL 3219642 (Ohio App. 2016) (affirming a summary judgment for Speedway because the "pothole" that tripped up the plaintiff in that case was, at its deepest point, less than an inch deep). *See also, Elstun v. Spangles, Inc.*, 217 P.3d 450 (Kan. 2009) (discussing and refusing to extend from sidewalks to parking lots Kansas's "slight defect" rule); *Milewski v. Washington Mut., Inc.*, 931 N.Y.S.2d 336 (N.Y. App. 2011) (applying New York's "trivial defect" rule, which eschews the per se approach and instead requires the trial court to determine, in light of the totality of circumstances, whether the defect at issue should be deemed trivial as a matter of law).

[13] *Cf.* Justice Venters's observation in his *Carter* dissent that public policy is hardly served "by imposing a duty that cannot be performed." *Carter*, 471 S.W.3d at 304 (Venters, J., dissenting).

20

unreasonable" as a matter of law. Without some such rule, they complain, how "may a property owner ever obtain summary judgment or a directed verdict in Kentucky?" We are certainly familiar with their lament, but decline the invitation.

Even if the *Carter* majority's seeming disavowal of the very idea that public policy might have anything legitimate to say about open and obvious defects (and hence land-possessor duties with respect to them) were not still reverberating in our ears, we would not entertain a "trivial defect" rule in this case. Simply put, we cannot accept Speedway's and the appellate panel's characterization of the hole at issue as necessarily "trivial."

Speedway's description of the pothole's size—"a one-inch deep depression in a well-lit area of a parking lot,"—was supported to some extent by Smith's testimony and by one of the photographs Defendants introduced during her testimony. It was contradicted, however, by the Grubbs' testimonies, and is belied, as noted above, by other photographic evidence, which shows inches-deep erosion in some parts of the affected area through at least one layer of asphalt.

In *Shelton,* we emphasized that under the comparative-fault approach to "open and obvious" conditions, the approach we endorsed and outlined in *McIntosh,* "summary judgment remains a viable concept." 413 S.W.3d at 916. We cautioned, however, that under that approach the question of "the unreasonableness of the risk of harm" of such a condition, will almost always be "properly categorized as a factual one," *i.e.,* that summary judgment (or

21

directed verdict) will be appropriate only when, under all the circumstances of the given case, "reasonable minds cannot differ" on the unreasonable-risk question, or "when only one reasonable conclusion [as to that question] can be reached." *Id.*

By any meaningful standard, the "trivialness" of the pothole or the "reasonableness" of the risk in this case was subject to rational disagreement. It was, therefore, a question for the finder of fact. The trial court's finding that in the circumstances of this case (in particular the hole's location in a heavily trafficked area), the relatively small hole still constituted an "unreasonably dangerous condition on the business premises," was not clearly erroneous, and thus the Court of Appeals erred when it substituted its different take on the evidence. *Lawson v. Loid*, 896 S.W.2d 1, 3 (Ky. 1995) ("The findings of the trial judge may not be set aside unless clearly erroneous with due regard being given to the opportunity of the trial judge to consider the credibility of the witnesses."). The trial court's factual finding prevails.

## II. Store Manager Smith Should Not Have Been Found Liable to the Grubbs.

Because Speedway and Smith are not entitled to relief from the trial court's Judgment on the "open and obvious" ground relied on by the Court of Appeals, we turn to their claims based on alternative grounds. Smith, the store's manager at the time of Teresa's injury, contends that the trial court erred by deeming her essentially a possessor of the premises, and thus liable in the same way and to the same extent as Speedway for the Grubbs' damages. Defendants contend that "a manager must have complete control over the

22

premises to be individually liable," and by no stretch of the imagination, they insist, could Smith be deemed to have had "complete control" over Speedway's premises.

Although unnecessary in light of its disposition of the case, the Court of Appeals' panel agreed with Smith that her position with Speedway did not give her the sort of control and supervision over the premises that would render her liable as a possessor, and so concluded that "Smith cannot be individually liable." Apparently concerned that Speedway's liability hinges on Smith's, the Grubbs note that our law has long provided that "servants or employees may be sued personally for alleged negligence in the course and scope of their duties." They insist that this must be so here lest Speedway escape its responsibilities. By confusing the source of Speedway's liability, the parties (and the trial court) complicated the question of Smith's liability, but for reasons only somewhat different than those the Court of Appeals' panel articulated, we agree with it that Smith should not have been found liable. The failure of the Grubbs' claims against Smith, however, by no means undermines their claims against Speedway.

To begin, as noted above, under the long-standing law of this state, "a possessor of land owes a duty to an invitee to discover unreasonably dangerous conditions on the land and either eliminate or warn of them." *Shelton*, 413 S.W.3d at 909. As the *Restatement (Second) of Torts* § 328E notes, the land's owner is not necessarily its possessor for the purposes of this rule. *See, e.g., Milewski v. Washington Mut., Inc.*, 931 N.Y.S.2d at 338 (explaining that "[w]hile

23

a landlord and tenant are free to agree with each other as to which party, as between them, will have the contractual obligation to make repairs, the tenant may not contract away a duty in tort that the law imposes on it with respect to third parties"). In general, rather, the possessor of premises for premises-liability purposes is that person (or entity) in occupation of the premises (or entitled to immediate occupation) with the intent to control them. *Hill v. Superior Prop. Mgmt. Services, Inc.,* 321 P.3d 1054, 1059 (Utah 2013) (discussing *Restatement (Second) of Torts* §§ 328E and 343, and stating that "under the *Restatement,* 'control' stemming from actual 'occupation,' . . . is the hallmark of possessor status."); *and see Restatement (Third) of Torts: Phys. & Emot. Harm* § 49 (2012) (defining "[a] possessor of land," in part, as "a person who occupies the land and controls it."). As thus understood, Speedway, the occupier and controller of its Manchester filling station, is clearly the "possessor" of those premises and therefore the party upon whom falls the possessor's duty to maintain the premises in a reasonably safe condition.

As we noted in *Dick's Sporting Goods,* moreover, that duty is non-delegable. 413 S.W.3d at 897, n. 16 (quoting Dan B. Dobbs, *et al., The Law of Torts* § 276 (2d ed. updated 2013)); and *see, Gazo v. City of Stamford,* 765 A.2d 505, 511-12 (Conn. 2001) (discussing a premises possessor's non-delegable duty to provide reasonably safe premises).[14] That means, as we recently explained in *St. Joseph Healthcare, Inc. v. Thomas,* 487 S.W.3d 864, 877 (Ky.

---

[14] We should note that, for reasons discussed below, we disagree with the Connecticut Supreme Court's invocation of respondeat superior in this context.

2016), in the context of a hospital's non-delegable statutory duty, that while Speedway can (indeed, as a corporation, it must) delegate to agents or others the performance of that duty, it cannot delegate to others its responsibility under the law of torts. Simply put, it remains directly, whether or not vicariously, liable for injury-causing breaches of that duty notwithstanding that the breach resulted from an agent's negligence.

A very similar issue arose in the case of *Devine v. Kroger Grocery & Baking Co.*, 162 S.W.2d 813 (Mo. 1942), which, like this case, involved a trip-and-fall on the premises of a retail business. In *Devine*, too, the injured customer sued both the corporate possessor of the premises and the store manager under negligence theories. A question arose whether the jury's verdict exonerating the manager was inconsistent with its verdict finding the company liable. The Court explained that in this situation the company's liability was not predicated solely on its vicarious liability for the torts of its agents or employees, but also on its own breach of its non-delegable duty to maintain safe premises. "Others," the Court observed,

> may or may not have been negligent with respect to the condition complained of and yet liability fastens on the appellant [Kroger] for its wrong which does not depend on respondeat superior. Consequently, there is no inconsistency in the jury's verdict and the motion in arrest of judgment was properly overruled.

162 S.W.2d at 818. Speedway's similar CR 59.05 motion might likewise have been overruled here. Since it was not, however, we address the Grubbs' contention that the trial court's amended Judgment appropriately found Smith liable.

25

We can begin by noting that the fact that Smith was *not* the "possessor" of the premises in the same sense that Speedway *is* the "possessor" does not mean that Smith has no potential liability. As the Grubbs correctly note, in Kentucky, "[i]t is firmly established . . . that an agent of a corporation is personally liable for a tort committed by him although he was acting for the corporation." *Peters v. Frey,* 429 S.W.2d 847, 849 (Ky. 1968). As the *Restatement (Third) of Agency* puts it,

> An agent's breach of a duty owed to the principal is not an independent basis for the agent's tort liability to a third party. An agent is subject to tort liability to a third party harmed by the agent's conduct only when the agent's conduct breaches a duty that the agent owes to the third party.

§ 7.02. Comment b. to § 7.02 notes that an agent's duty to a third party could be derived from tort law, from contracts or promises of the agent intended to benefit the third party, or from statutes designed to protect a class inclusive of the third party.

In the premises liability context, *Restatement (Second) of Torts* § 387 has been invoked as a possible source of an agent's duty to third parties. *See Hill v. Superior Prop. Mgmt. Services, Inc.,* 321 P.3d at 1060-61 (addressing such a claim). That section provides that where an "owner or possessor of land turns over the entire charge of the land" to "an independent contractor or servant," that person "is subject to the same liability for harm . . . as though he were the possessor of the land." Although the Grubbs do not refer expressly to this section of the *Restatement,* something along those lines seems to underlie their

26

contention that "Speedway's control of the premises was exercised by and through Roxanne Smith and its other employees."

As the comments to § 387 make clear, however, this section contemplates an agent or contractor (such as the property management company, perhaps, involved in *Bradford v. Lexington-Fayette Urban Cty. Government,* 2005 WL 327177 (Ky. App. 2005), to which both sides have referred) who has "taken over the entire charge of the land or building," not someone who has undertaken merely "to make specific repairs, or even to inspect the land or building and from time to time to make such repairs as he should discover to be necessary." Smith, who did not undertake and had no authority to make repairs, clearly did not have "the entire charge of the land or building," and so is not subject to the possessor's duty under that theory.

The Grubbs do refer us to § 383 of the *Restatement (Second) of Torts,* which provides that

> One who does an act or carries on an activity upon land on behalf of the possessor is subject to the same liability, and enjoys the same freedom from liability, for physical harm caused thereby to others upon and outside of the land as though he were the possessor of the land.

The Grubbs apparently would read § 383 broadly as imposing a duty on Speedway's "employees and those persons carrying on an activity on behalf of [Speedway] . . . to keep the passageway from the exit of [the] store through the service area to their vehicles in a reasonably safe condition and state of repair."

Rejecting a similarly expansive reading of § 383, the Utah Supreme Court noted that the commentary to the section makes such claims untenable.

27

According to the commentary "this section 'applies only to harm done by some act done or activity carried on upon the land,' where 'the rules which determine liability for bodily harm caused by a dangerous condition created upon the land by persons acting on behalf of the possessor' are stated in other sections." *Hill v. Superior Prop. Mgmt. Services, Inc.*, 321 P.3d at 1061 (quoting *Restatement (Second) of Torts*, § 383 cmt. c.).

Finally, the Grubbs fall back upon the principle that "every person owes a duty to every other person to exercise ordinary care in his activities to prevent foreseeable injury. . . . The concept of liability for negligence expresses a universal duty owed by all to all." *Shelton*, 413 S.W.3d at 907. Without speculating as to how this "universal duty" might apply in these circumstances,[15] we readily acknowledge that the question of a land possessor's agent's liability to third persons for the agent's nonfeasance is quite difficult. As the parties' citations to cases from other jurisdictions amply demonstrate, some states still apply the old common-law rule that an agent cannot be liable for nonfeasance,[16] while others have entertained claims of

---

[15] We do note, however, that even the *Restatement (Third) of Torts: Liability for Phys. & Emo. Harm* (October 2016 update) retains the distinction between risks created by the actor (to which the "universal duty" is usually thought to apply), § 7, and risks not created by the actor, with respect to which the general rule is that the actor "has no duty of care to the other." § 37. The Grubbs' blurring of this important distinction obviously raises questions far beyond this case.

[16] *See, Edmond v. Food Lion, Inc.*, 895 F. Supp. 103 (E.D. Va. 1994); *Harris v. Morrison, Inc.*, 32 Va. Cir. Ct. 298 (1993) (dismissing, with citation to *Turner v. Corneal*, 159 S.E. 72 (Va. 1931), slip-and-fall negligence complaint against the manager of a cafeteria where the alleged negligence was the manager's failure to "maintain" the cafeteria.); *Boyce v. Wal-Mart Stores, Inc.*, 2016 WL 2941339 (D. Kan. 2016) (discussing that under Kansas law, a store manager cannot be held individually liable to third parties for merely failing to perform her job duties).

28

agent liability under the *Restatement (Second) of Torts* §§ 323 and 324A, the so-called undertaker's doctrine. Under that doctrine, a person who "undertakes . . . to render services to another which he should recognize as necessary for the protection of the other's person" is liable in certain circumstances "for physical harm resulting from" a "failure to exercise reasonable care to perform [the] undertaking."[17] In between these extremes, courts have considered and applied a number of different approaches.[18]

As the parties' resort to foreign authority indicates, Kentucky precedent in this area is sparse. We do note, however, that our predecessor Court made Kentucky one of the first jurisdictions to reject the old common-law "misfeasance/nonfeasance" distinction as a guide to an agent's liability to third parties, preferring a rule more like that from the *Restatement (Third) of Agency* quoted above. "The doctrine is settled in this State that the servant is personally liable, whether his act be that of misfeasance or nonfeasance, when the injury flows from some breach of a duty owed by him." *Murray v. Cowherd,*

---

[17] *See, Hill v. Superior Prop. Mgmt. Services, Inc.,* 321 P.3d at 1062; *Gazo v. City of Stamford,* 765 A.2d at 511; *Richardson v. Wal-Mart Stores Texas, LLC,* 2016 WL 3346542 (S.D. Texas 2016).

[18] For example, *see, Bryant v. Sherm's Thunderbird Mkt.,* 522 P.2d 1383 (Or. 1974) (reversing dismissal of negligence claims against a contractor employed on the premises, and referring to § 383 of the *Second Restatement of Torts*); *Ford v. Elsbury,* 32 F.3d 931 (5th Cir. 1994) (citing *Canter v. Koehring,* 283 So.2d 716 (La. 1973) for the test for determining when an agent might be liable to third parties for non-performance of an employment duty) (*Canter* has been overruled by statute on other grounds, as noted in *Walls v. American Optical Corp.,* 740 So.2d 1262 (La. 1999)); *Reynolds v. Schucks Markets, Inc.,* 2009 WL 2259392 (S.D. Ill. 2009) (construing Illinois law to allow a store manager with sufficient control over the premises to be held liable to third parties for neglect of employment duties).

148 Ky. 591, 593, 147 S.W. 6, 7 (1912) (citing with special approval *Haynes'*
*Adm'r. v. C., N.O. & T.P. Ry. Co.,* 145 Ky. 209, 140 S.W. 176 (1911)).

The older cases, many of them involving allegations against railroad
employees for negligent operation of trains, do not provide any simple guidance
as to when an agent has a duty to a third party. A theme common to many of
them, however, is that liability is more apt to attach the more control the agent
has over the injury-causing implement or condition. Compare *Haynes, supra*
(holding that a railroad engineer could not be held accountable for a defective
engine when he had no role in preventing the defect or in choosing whether to
use the engine), with *Murray, supra* (holding that a telephone pole inspector
could be held accountable for a defective pole that fell and injured the plaintiff,
because, among other reasons, the inspector had full authority and the
wherewithal to replace defective poles when he found them).

This emphasis on control is reflected in what appears to be the only
Kentucky premises case raising these agency questions. In *Sabiston's Adm'r v.*
*Otis Elevator Co.,* 251 Ky. 222, 64 S.W.2d 588 (1933), a case in which the
plaintiff's decedent was killed as a result of a defective condition on the
premises—an excessive space between the floor of the building and the floor of
the elevator serving the building--the Court rejected negligence claims against
the company that installed the elevator and against a receiver appointed to
collect rents during the pendency of a foreclosure action. Neither defendant,
the Court explained, had any control over the manner in which the building
had been constructed or made to align with the elevator. *Id.* at 591.

30

At least roughly in line with our cases, the Texas Court of Civil Appeals has noted, in one of its retail-store-slip-and-fall cases in which the manager/agent was accused of negligence (and found to be negligent), that an agent's degree of control over the premises is a key element in determining whether the agent bears any duty to third persons. "The servant," that court said after referencing various *Restatement* provisions,

> must be the custodian, in complete charge and control of the premises, given the duty by the master to see that the particular defect does not exist and vested by the master with authority to correct this defect.

*S.H. Kress & Co. v. Selph,* 250 S.W.2d 883, 893 (Tex. Civ. App. 1952).

Whether *Selph's* ultimate holding—that the manager in that case was liable for his breach of employment duties—remains the law in Texas has been questioned. *Solis v. Wal-Mart Stores East, L.P.,* 617 F.Supp.2d 476 (S.D. Tex. 2008). But we are not so much concerned with *Selph's* ultimate holding, as we are with its recognition that, in order for a land-possessor's agent to be liable to a third party for breach of an employment duty, the agent must have sufficient control over the premises to remedy the premises' alleged defect. That requirement is consistent with our precedent, spare as it is, and since Smith clearly did not have that degree of control, we agree with the Court of Appeals that she should not have been found liable to the Grubbs.

Justice Venters's Separate Opinion insists that employees, store managers included, can be held liable for their independent torts committed in the course of their employment, a point we absolutely agree with and discuss

31

in addressing § 7.02 of the *Restatement (Third) of Agency.* As the Separate Opinion's lengthy, string-cite footnote shows, Kentucky law has long recognized that an employee who, in the course of employment, breaches his or her independent tort duty to a third-party can be held liable for resulting injuries. This means, for example, as those cases also show, that employees who drive negligently in the course of employment, use tools negligently, or in some other way actively bring about an unreasonably dangerous condition and cause injury to a third person as a result are subject to liability therefor. The Separate Opinion's suggestion that our Opinion alters in any way this well-established law and immunizes employees from such liability is simply (and clearly) wrong. Had Smith somehow caused the hole in the Speedway lot that tripped Teresa Grubb, then her potential liability for having done so, for having breached her "universal duty" to act with care toward others, would be clear.

However, it has *never* been the law in Kentucky that, outside a small number of exceptions, one has a duty, much less a "universal duty," to protect others from dangerous conditions one has not caused or created. *Restatement (Third) of Torts* § 37 (2012). Independent of her employment relationship, therefore, Smith, who no one claims caused the Speedway pothole, no more had a tort duty to protect Teresa Grubb from that hazard than anyone else including, for example, a Speedway customer who saw that an inattentive Grubb was approaching the pothole but nevertheless said nothing to warn her.

The possessors of business premises, of course, are among the exceptions to the general rule of no affirmative duty. *Restatement (Third) of*

32

*Torts: Phys. & Emot. Harm* § 40(b)(3) (2012). Such persons or entities generally do have a non-delegable, affirmative duty to protect their invitees from unreasonably dangerous conditions on the premises however those dangerous conditions came to be. *Shelton,* 413 S.W.3d at 909. The question in this case becomes, therefore, to what extent, if any, does Smith's employment relationship with Speedway impose upon Smith an affirmative duty, in addition to that of Speedway, to protect third persons, a duty that, outside the employment relationship, Smith does not have. The Separate Opinion begs this question and simply presumes that Smith's duties are Speedway's duties, because Speedway must act through its agents. Thus, according to that approach, if Smith neglects her *employment* duty to Speedway, and that breach amounts to a breach of Speedway's non-delegable, affirmative *tort* duty to an invitee then Smith's employment breach must also amount to a breach of Smith's vicariously assumed affirmative *tort* duty to that third party.

The Separate Opinion thus suggests a sort of *"respondeat inferior,"*—the employee is liable because the employer is liable. Indeed, that Opinion would impose on Smith a duty beyond those borne by Speedway. As we noted in *Shelton,* premises owners, notwithstanding their affirmative duty to provide invitees with safe premises, generally have no duty to warn of obviously dangerous conditions because the condition serves as its own warning. *Shelton,* 413 S.W.3d, at 914 (noting that "the open-and-obvious doctrine . . . eliminates a defendant's duty to warn because the condition is a warning in itself."). The Separate Opinion, nevertheless, would allow Smith, the employee,

33

to be found liable for failing to warn, even though the premises owner itself had no such duty. But that, of course, has never been the law, either in Kentucky or any place else.

As noted *supra, The Restatement (Third) of Agency* § 7.02 reminds us that by itself "[a]n agent's breach of a duty owed to the principal is not an independent basis for the agent's tort liability to a third party." In earlier days, the general rule was that the agent's mere neglect, non-performance, or omission of an employment duty (as alleged in this case) could never give rise to the agent's tort liability to a third party, a rule that persists in a small number of jurisdictions as we have noted. Our predecessor Court, however, rejected that bright-line approach, and allowed an agent's employment omission to be assessed for third-party tort liability on a case-by-case basis. That said, the old High Court never attempted to articulate a rule, *i.e.,* to delineate the conditions that would justify departure from the old rule and allow the non-performing employee to be held liable. As this Opinion notes, other courts around the country *have* made that attempt, with widely diverse outcomes.

We have not made that attempt in this case; *i.e.,* we have not attempted to state in a general and comprehensive way, by marshalling all the factors to be considered, including the public policy questions, when an employee's employment omission subjects the employee to third-party tort liability. The full-scale undertaking is unnecessary in this case, because while (contrary to the Separate Opinion's assertions) there appears to be no Kentucky premises

34

liability case dealing with a non-performing agent's tort liability to a third party, Kentucky cases from other contexts make the appropriate outcome in this case clear enough. As noted *supra*, those cases limit the agent's potential liability to situations in which the agent was in substantial control of the injury-causing object or condition. In our view, Smith's limited managerial position, especially with regard to premises maintenance, comes nowhere near the control that has been deemed necessary.[19]

In summary, even assuming that circumstances might exist in which a store manager could be deemed liable to a business invitee for the manager's failure to perform employment duties pertaining to the business premises, the store manager here, Smith, did not have sufficient control over Speedway's premises to incur that sort of liability. Her lack of liability, however, does not undermine the Grubbs' Judgment against Speedway itself, since Speedway was both directly, as well as vicariously, responsible to the Grubbs for maintaining reasonably safe premises.

### III. The Trial Judge Was Not Required to Recuse.

Another issue presented to the Court of Appeals was Defendants' contention that the trial judge, Judge Oscar House, abused his discretion when he denied Defendants' post-trial motion that he recuse. As noted above, after the trial of this case in January 2010, but while the court's judgment was still pending, allegations surfaced in a federal criminal trial that Judge House and

---

[19] Interestingly, Smith was not even on duty when this incident occurred, her shift having ended hours earlier.

the Grubbs' attorney, Yancey White, were participants in a conspiracy among prominent citizens in Clay County to buy votes and to rig local elections. Although the federal trial had taken place several months prior, Defendants waited until Judge House entered what turned out to be, to them, an unfavorable Judgment before seeking recusal. They maintained that the allegations floated in the federal trial created an appearance of impropriety where, as here, Judge House presided over a case involving attorney White, and entitled them to a new trial from which Judge House should be recused. As previously noted, Judge House denied Defendants' new-trial/recusal motion, and the Court of Appeals declined to review that ruling because its reversal of the Judgment on open and obvious grounds rendered it moot.

Our reversal of the Court of Appeals' opinion reopens the recusal claim, and the first question that reopening raises is whether we should follow our usual practice and remand the matter to the Court of Appeals or, as the Grubbs urge in light of the decade this case has already dragged on, whether we should review the trial court's recusal decision ourselves. Having concluded that the recusal question can be readily addressed, we have decided to forego a remand and turn to the merits of the recusal motion.

Under both our Code of Judicial Conduct and Kentucky Revised Statutes (KRS) Chapter 26A, "a judge shall disqualify in a judicial proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where: (a) the judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge of disputed

36

evidentiary facts concerning the proceeding.'" *Alred v. Commonwealth*, 395 S.W.3d 417, 430 (Ky. 2012) (quoting SCR 4.300 Canon 3(E) and citing KRS 26A.015(2)(a) and (e)); *see also, Stopher v. Commonwealth*, 57 S.W.3d 787, 794 (Ky. 2001); *Petzold v. Kessler Homes, Inc.*, 303 S.W.3d 467, 471 (Ky. 2010). "'The burden of proof required for recusal of a trial judge is an onerous one. There must be a showing of facts of a character calculated seriously to impair the judge's impartiality and sway his judgment.'" *Alred*, 395 S.W.3d at 430 (quoting *Stopher*, 57 S.W.3d at 794). The inquiry is meant to be "an objective one, made from the perspective of a reasonable observer who is informed of all the surrounding facts and circumstances." *Id.* (citations omitted). We review recusal decisions for abuse of discretion. *Minks v. Commonwealth*, 427 S.W.3d 802, 806 (Ky. 2014) (citing *Hodge v. Commonwealth*, 68 S.W.3d 338, 345-46 (Ky. 2001)).

In *Alred,* we noted that the "intensity" of a judge's relationship with a trial participant, such as one of the attorneys, is an important factor in assessing whether the judge's impartiality might reasonably be questioned. At one end of the intensity continuum, we noted,

> is the judge's complete unfamiliarity with a lawyer, a witness[,] or a litigant, except in a judicial setting. [In that situation,] [n]o recusal is required. On the other extreme is a judge's close personal relationship with a lawyer, a party[,] or a witness, such as a family member or a spouse. Recusal [in that situation,] is required under Canon 3E(1). At some point between these two extremes, a judge and a participant in a case may have such a close social relationship that a judge should disclose the relationship to attorneys and parties in a case and, if need be recuse.

37

395 S.W.3d at 430 (citing *Judicial Ethics Opinion* 119, 2010 WL 7080288 at 1 (2010) (internal quotation marks omitted). While not exactly calculated to clear up thorny recusal questions, these observations do provide a framework for addressing Defendants' concerns.

Speedway and Smith contend the conspiracy allegations regarding Judge House and attorney White that arose in the aforementioned federal trial created an appearance either that (1) the relationship between them was "intense" enough to call Judge House's impartiality into question, or (2) the two men had such a penchant for underhandedness as to call into question the judge's impartiality. In his Order denying a new trial and recusal, Judge House denied any involvement in a vote buying conspiracy or any questionable relationship with attorney White. He further explained that, in his view, no reasonable person would question his impartiality based only on unsupported allegations mentioned for an entirely different purpose in the course of an unrelated federal trial. We agree. A reasonable person would want more than innuendo and unsupported allegations to conclude that a judge's impartiality had been impugned.

Speedway contends that there is more. It answers Judge House's observation that it waited until after the judge's unfavorable ruling to raise its objection by contending that the Judgment was not merely unfavorable but was outrageously so, so favorable to White's client as to confirm a reasonable person's doubts and questions about the judge's impartiality. Although we agree with Speedway that an award of pain-and-suffering damages in excess of

38

thirty times the medical expenses might raise eyebrows, Speedway's argument is belied to some extent by the fact that it did not challenge the damages award as excessive, an unusual challenge in a bench trial, perhaps, but one our rules certainly allow. *See* CR 59.01(d), and *cf. Dennis v. Fulkerson,* 343 S.W.3d 633 (Ky. App. 2011) (holding that a CR 59.05 motion to reduce a damages award should have been granted). Notwithstanding the large pain-and-suffering award, we remain convinced that Judge House did not abuse his discretion when he determined that a reasonable person would not have found the unsupported conspiracy allegations and an unfavorable Judgment enough to call his impartiality into question. We would observe, however, as the United States Supreme Court noted in *Liljeberg v. Health Services Acquisition Corp.,* 486 U.S. 847 (1988), that a judge's duty to avoid the appearance of impropriety is a continuing one. The question can be revisited on remand in this case if, in the several years since the question first arose, additional concerns have come to Speedway's notice.

## IV. The Trial Court's Failure to Make Appropriate Apportionment Findings Amounted to a Palpable Error.

Finally, before the Court of Appeals, Defendants argued that should the Court determine that they were not entitled to a directed verdict under the open and obvious doctrine, the trial court's failure to address Teresa's comparative fault was an error entitling them to a remand for consideration of that question. The Court of Appeals, of course, ruled that Defendants *were* entitled to a directed verdict, and as with the trial court's decision not to recuse, it properly declined to address the issue of Teresa's comparative fault.

39

Before us, Defendants reiterate their comparative-fault claim and insist that if we reverse the Court of Appeals, this case should be remanded to address the issue of comparative fault. We agree.

As Defendants correctly note, in *McIntosh* we were emphatic in pointing out that while the obviousness of the condition that occasioned the plaintiff's injury did not, under the comparative-fault approach, preclude the plaintiff's claim, "only under extremely rare circumstances" under that approach "could a plaintiff [injured by an obvious condition] avoid some share of fault." *McIntosh*, 319 S.W.3d at 392. This case does not present "extremely rare circumstances." Quite the contrary, as Teresa herself testified, it presents the utterly mundane circumstance of a person who, engaged in conversation with a friend, fails to watch where she is going and trips on an obvious flaw in the pavement.

Some portion of the responsibility for her injuries should have been attributed to Teresa, but the trial court did not even address the question. We agree with Defendants that the trial court's lapse was a "substantial error" requiring us to vacate the Judgment and to remand to that court for the findings mandated by KRS 411.182(1). And while it is for the trial court to determine in the first instance the percentages of fault, as provided for in KRS 411.182(2), we reiterate that in light of Teresa's admitted carelessness, the percentage attributed to her should not be insignificant.

The Grubbs resist this conclusion by insisting that Defendants failed to preserve the issue by requesting a comparative fault finding in accord with CR 52.04. Defendants concede their failure to make the request, but claim that

the trial court's abrupt and cursory manner of ruling relieved them of that obligation by making it clear that any such request would be fruitless. We need not address that claim, for, while the Grubbs are certainly correct that in general unpreserved errors are not subject to appellate review, there is a limited exception to that general rule for errors the appellate court deems palpable, *i.e.*, obvious, egregious errors by the trial court that have resulted in manifest injustice. *Fischer v. Fischer,* 348 S.W.3d 582, 589 (Ky. 2011) (citing CR 61.02, the substantial error rule). That exception applies here.

The trial court's failure to make the apportionment findings that had been statutorily required for more than twenty years at the time of its Judgment was an error plain enough to come within the palpable-error exception, and the error resulted, we are convinced, in a manifest injustice. At least since *McIntosh,* as the quote above from that case shows, we have been laboring to assure that the comparative-fault approach to open and obvious hazards is fair to both sides, that it does not subject premises owners to liability for a business invitee's own negligence. The trial court's Judgment in this case makes that assurance seem hollow, indeed, as the effect of the trial court's error is precisely to saddle Speedway with the entirety of a large damages award, when much of the fault giving rise to those damages was clearly the plaintiff's own. This is thus one of those extraordinary cases where, notwithstanding the lack of preservation, a plain error—the trial court's failure to make appropriate apportionment findings—should be noticed on appeal and remanded for correction.

41

## CONCLUSION

In sum, the Court of Appeals' opinion holding that the Grubbs' claims are barred by the open and obvious doctrine is reversed, and the trial court's findings of fact are reinstated, including any findings of fact regarding the amount of damages. All concur with this conclusion except Justice Cunningham who dissents for the reasons stated in his Concurring in Part, Dissenting in Part Opinion. For the reasons stated, three members of the Court (C.J. Minton, J. Hughes, and J. Cunningham) agree with the Court of Appeals' conclusion, in dicta, that Roxanne Smith, the manager of the Speedway SuperAmerica had no liability for the Grubbs' claims. Three members of the Court disagree for the reasons stated in Justice Venters's Separate Opinion. Finally, we unanimously conclude the trial court did not err in denying the post-judgment recusal motion but it did err, palpably, in not assessing comparative fault as required by KRS 411.182, although Justice Wright would not direct that the trial court must assign some portion of the fault to Teresa Grubb. This matter is remanded to the trial court for further proceedings consistent with this Opinion.

Part I: Minton C.J.; Keller, Venters, and Wright, JJ., concur. Cunningham, J., dissents for the reasons stated in his Concurring in Part, Dissenting in Part Opinion.

42

Part II: Minton, C.J.; and Cunningham, J., join Part II of the Opinion. Keller, Venters, and Wright, JJ., do not join for the reasons stated in Venters, J., Separate Opinion.

Part III: Minton C.J.; Cunningham, Keller, Venters, and Wright, JJ., concur.

Part IV: Minton, C.J.; Cunningham, Keller, and Venters, J., concur. Wright, J., dissents for the reasons stated in his Concurring in Part, Dissenting in Part Opinion.

VanMeter, J., not sitting.

CUNNINGHAM, J., CONCURRING IN PART AND DISSENTING IN PART: Consistent with my votes in the previous cases cited by the Majority abrogating the old "open and obvious" principle, I dissent to that portion of the opinion. However, I concur in the exoneration of Roxanne Smith and the recusal issue. Therefore, I concur in part and dissent in part.

VENTERS, J., SEPARATE OPINION: Because of this Court's recent opinions in *Carter v. Bullitt Host, LLC*, 471 S.W.3d 288 (Ky. 2015), and *Shelton v. Kentucky Easter Seals Society, Inc.*, 413 S.W.3d 901 (Ky. 2013), with its abolition of the traditional "open and obvious" doctrine, we are constrained to agree with the lead opinion of Justice Hughes insofar as it holds that Speedway must be held to account for Teresa Grubb's injuries despite the open and obvious condition she overlooked when she fell. Under the open and obvious doctrine, Grubb's claims against Speedway and Smith would have been dismissed once the obvious nature of the hazard was established.

We also accept the conclusion that this Court is bound by the trial court's finding of fact that, "in the circumstances of this case (in particular the hole's location in a heavily trafficked area), the relatively small hole still constituted an 'unreasonably dangerous condition on the business premises.'" We also accept Justice Hughes' conclusion that Speedway may be found liable for failing to eliminate the pothole hazard that tripped Grubb because

> a reasonable fact-finder could readily have believed that Speedway could and should have anticipated a duly cautious pedestrian's being distracted momentarily by a moving car or blinded momentarily by a car's headlights so as to encounter the pothole notwithstanding its obviousness. Under the comparative fault doctrine since Speedway could reasonably be thought to have breached its duty to the careful, [Grubb's] claim remained viable even though by her own admission she was careless.

However, we do not agree with the conclusion reached in Part II of Justice Hughes' opinion that store manager Smith is immune from suit for liability that arises from her own individual and independent negligence which caused or contributed to Grubb's injury. The doctrine of *respondeat superior* assures that her employer, Speedway, will remain jointly liable for the damages attributable to Smith's failure to exercise reasonable care, but that does not negate Smith's negligence, nor does it extinguish Grubb's right for whatever reason she chooses to assert her claim directly against Smith, however distasteful that may seem.

Speedway's liability upon the grounds postulated in Justice Hughes' opinion is necessarily derived from the negligence of its employees on the scene, including Smith, who as the manager in charge of the store was acting as Speedway's eyes and ears on the premises at the time of the injury. If

44

Speedway as a corporate entity "should have anticipated," as noted in the lead opinion, a "duly cautious pedestrian's" encounter with the pothole, it could do so only through the personal conduct of its employees on the premises. The evidence clearly established that Smith's duties included policing the tarmac around the gas pumps and the parking areas for hazards and trash at regular intervals. More significantly, she was required to report any hazardous conditions that she could not repair immediately to Speedway's central office so that the employer could arrange for a repair.

*Shelton* may have abolished the open and obvious doctrine, but it also reaffirmed this standard of care:

> First and foremost, a land possessor is subject to the general duty of reasonable care. The concept of liability for negligence expresses a universal duty owed by all to all. And every person owes a duty to every other person to exercise ordinary care in his activities to prevent foreseeable injury.

413 S.W.3d at 908 (internal quotations and citations omitted). *Shelton* also reaffirmed the principle that "a possessor of land owes a duty to an invitee to discover unreasonably dangerous conditions on the land and either eliminate or warn of them." *Id.* at 909 (citations omitted). Smith was aware of the hazard that she could not immediately eliminate. As Speedway's eyes and ears on the ground, in the exercise of "reasonable care," she should have known the hole was a hazard to invitees dodging cars or blinded by headlights and provided a warning for distracted pedestrians otherwise unable to avoid it.

Until now, Kentucky law has not exempted neglectful employees from the consequences of their own negligent acts or omissions while holding the

45

employers vicariously liable for employees' negligent acts or omissions. The opinion of Justice Hughes radically departs from this long-established and unchallenged authority. Prevailing Kentucky law and the universally-accepted and applied principle are embodied in the *Restatement (Second) of Agency* § 343 (1958):

> *An agent who does an act otherwise a tort is not relieved from liability by the fact that he acted at the command of the principal or on account of the principal,* except where he is exercising a privilege of the principal, or a privilege held by him for the protection of the principal's interests, or where the principal owes no duty or less than the normal duty of care to the person harmed.

(Emphasis added.)[20]

---

[20] Consistent with Section 343, it has long been the rule in Kentucky that "an agent is personally liable for his own tortuous acts even though performed within the scope of his employment and under conditions which impose liability upon the principal also." *Carr v. Barnett*, 580 S.W.2d 237, 240 (Ky. App. 1979) (citing *Kentucky-Tennessee Light and Power Co. v. Nashville Coal Co.*, 37 F. Supp. 728 ([W].D. Ky. 1941)). Indeed, "it has long been the law of this jurisdiction that the party harmed can look for reparation from the agent only, without the necessity of proceeding against the principal." *Id.* (citing *Pool v. Adkisson*, 31 Ky. 110 (Ky. 1833)); *see also Enos v. Kentucky Distilleries & Warehouse Co.*, 189 F. 342, 346 (6th Cir. 1911) ("[I]n Kentucky, the servant whose negligent act creates the liability of the corporation may, as a matter of right be joined as defendant with the corporation."); *Cohen v. Alliant Enterprises, Inc.*, 60 S.W.3d 536, 539 (Ky. 2001) ("[A] plaintiff may bring suit and recover from the principal under a vicarious liability theory without first filing suit and getting a judgment against the agent" *or* may "sue[ ] both the principal and the agent together."); *Brown v. Ellis*, 484 A.2d 944, 946-47 (Conn. Super. 1984) (citing *Deaktor v. Fox Grocery Co.*, 332 F. Supp. 536, 542 (W.D. Pa. 1971), *aff'd*, 475 F.2d 1112 (3d Cir. 1973)) ("Under principles of agency law, an agent may be individually liable for torts committed by him, even though the agent contends that such acts were committed on behalf of the principal."); *Conn v. Markwest Hydrocarbon, Inc.*, 2006 WL 782728 at **2-3 (E.D. Ky. Mar. 27, 2006) ("Kentucky law permits servants or employees to be sued personally for alleged negligence in the course and scope of their duties for the principal or employer."); *Terry v. Jackson*, 19 Fed. Appx. 377, 379 (6th Cir. 2001) ("There is no authority under Kentucky law that an individual is not jointly and severally liable for torts committed within the scope of employment.").

Similarly, in *Wheeler v. Frito-Lay, Inc.*, the presiding federal district court stated as follows:

If, as Justice Hughes' opinion holds, the defective pavement was an unreasonably dangerous condition, such that Speedway in the exercise of reasonable care should have acted to "either eliminate [it] or warn of [it]," per *Shelton*, then, a fortiori, the same defect was a danger that imposed a duty upon Smith. As the employee with managerial control of the premises, in the exercise of reasonable care, she should have eliminated the defect by contacting Speedway to arrange a repair, and in the meantime, acted to warn distracted customers who may not see the hazard in time to avoid injury. Speedway's failure to comply with the standard of care flows directly from Smith's failure to comply with the standard of care applicable to her.

Despite its acknowledgment that "a possessor of land owes a duty to an invitee to discover unreasonably dangerous conditions on the land and either eliminate or warn of them," the lead opinion contradicts itself by holding, on one hand, that Speedway's failure to eliminate or warn of the hazard could

---

However, *the fact that a judgment may be entered against an employer does not absolve the employee of liability for his acts; rather, the doctrine of respondeat superior operates to establish a joint and several liability between both the employer and the employee.* Granquist [v. Crystal Springs Lumber Co., 1 So. 2d 216, 218 (Miss. 1941)]. While the liability of an employee under respondeat superior may not be individual in the sense that the employee is the only party responsible for the payment of any judgment, *the employee nevertheless remains liable for the total amount of any judgment, though such liability will be joint and several with his employer.*

743 F. Supp. 483, 485-86 (S.D. Miss. 1990) (emphasis added); *see also Southard v. Belanger*, 966 F. Supp. 2d 727, 742-43 (W.D. Ky. 2013) (citing *Bowen v. Gradison Constr. Co.*, 6 S.W.2d 481, 482-83 (Ky. 1928)) ("Under Kentucky law, an employer is jointly and severally liable for the negligence of any employee who is acting within the course and scope of employment at the time of the negligence.").

47

reasonably be regarded as a violation of the standard of care, but on the other hand, holding that Smith's failure to do anything to eliminate it or warn of it, despite her actual knowledge of it, does not violate the standard of care.

The lead opinion absolves Smith of responsibility by concluding that she cannot be regarded as a "possessor of the land" because she lacked "sufficient control over the premises to remedy the premises' alleged defect." We agree with Justice Hughes' conclusion that one need not have "complete control" of the premises to incur liability as a "possessor of land." The rule as stated in her opinion implies that one may be liable as a "possessor of land" for some hazards, but not for others, depending on the degree of control one is authorized to exercise, and we agree. Accordingly, several individuals may qualify as a "possessor" of the same premises at the same time, depending upon their specific responsibilities.

But the lead opinion misconstrues the standard by ignoring the fact that, in the exercise of reasonable care, per *Shelton*, a possessor of land may remedy an obvious but unreasonably hazardous hole in either of two ways: fill the hole or post a warning. The inability to effect a remedy by one route does not eliminate the duty to use reasonable care to pursue the alternate remedy. Even if Smith lacked the authority to fill the hole, she had plenary control to remove the danger by warning patrons. With routine regularity we see employees of Speedway and other businesses post warning placards or pylons that alert distracted patrons to hazards on the premises, including hazards around gas pumps.

Smith was aware of the defect for weeks. Had she exercised her control of the premises with reasonable care and notified her Speedway supervisors of the hazard, or posted a warning, she could argue that she had complied with the standard of care. *Shelton* reiterated and reinforced the principle that "every person owes a duty to every other person to exercise ordinary care in his activities to prevent foreseeable injury." *Id.* at 908. Smith is not immune from that principle. It is no less applicable to her as it is to Speedway. If the exercise of reasonable care required Speedway to fix the hole, then the exercise of reasonable care would also require Smith to report the hole to Speedway. Doing so in a timely manner would have eliminated the hazard before Grubb fell. Smith's control over the premises as a "possessor of the land" extended at least that far. Her failure in those respects could be reasonably found to violate the applicable standard of care and to constitute a substantial factor causing or contributing to Grubb's injury.

One of the fundamental purposes of tort law is to incentivize careful behavior and to discourage careless behavior. *Giuliani v. Guiler*, 951 S.W.2d 318, 320 (Ky. 1997) ("It is the purpose of all tort law to compensate one for the harm caused by another and to deter future wrongdoing."). Until now, tort policy assured that on-duty managerial employees had a personal stake in exercising reasonable care for the safety of invitees coming onto the premises. In the absence of a countervailing social policy which our colleagues have not cited, we respectfully contend that the law should remain that way.

In summary, the evidence in this case solidly establishes that Smith's managerial duties to inspect, sweep, and remove trash from the premises, together with her $100/day necessities budget, vested her with sufficient supervisory and possessory control of the premises to impose upon her a duty as a possessor on the land to report the hazardous pothole so that it could be repaired, and until that occurred, to post sufficient warning of the hazard. Her failure to do so could be reasonably regarded as a failure to exercise reasonable care. The authorities cited above unambiguously stand for the principle that if an employee independently commits a tort resulting in an injury to a plaintiff, she may be held liable for those torts by the injured party. The fact that she was on-the-clock in the service of her employer at the time of her potentially tortious conduct, and that her employer is vicariously liable for her conduct, does not cloak her with immunity from the tort, but that is precisely what the opinion of our esteemed colleagues would do.

Keller and Wright, JJ., join.

WRIGHT, J., CONCURRING IN PART AND DISSENTING IN PART:

Because I agree that the Grubbs' claims are viable under *McIntosh* and the other cases cited by Justice Hughes and that the trial judge was not required to recuse, I join Parts I and III of Justice Hughes's opinion. I join Justice Venters's opinion on the store manager's individual liability.

I am compelled, however, to also write separately for two reasons. One reason is to make a request to the bench and bar—that request piggybacking off of Justice Hughes's superb discussion of our recent jurisprudence

50

abandoning the open-and-obvious doctrine as a legal bar to certain premises-liability causes of action. The other reason is to explain why I must respectfully dissent to Part IV of Justice Hughes's opinion on the apportioning-fault issue to the extent it usurps the trial court's fact-finding role. I begin with the latter.

To be sure, I agree with Justice Hughes that this case must again be remanded to the trial court for it to address the parties' comparative fault under KRS 411.182. But where I disagree is in her concluding that some portion of fault necessarily falls to Teresa Grubb and directing the trial court on remand to so find. That, in my opinion, goes beyond the appropriate scope of our review in this case.

As Justice Hughes acknowledges, our comparative-fault regime entrusts to the factfinder the task of apportioning fault among all those responsible to some degree for tortious injury. (That factfinder here, of course, is the trial judge, not a jury, because this was a bench trial.) It is the factfinder who hears all of the evidence at trial and who is obliged to determine whether and to what extent each party contributed to bringing about the plaintiff's injuries based on its view of that evidence. It is not the prerogative of a reviewing court to take on that task. Yet, in my view, Justice Hughes's opinion does just that.

So I would remand this case to the trial court to answer the first question, based on its assessment of all the evidence, whether Teresa Grubb's own negligence contributed to her injuries and, then, how much fault for her injuries should be apportioned to that negligence under KRS 411.182. I respectfully dissent from Part IV of Justice Hughes's opinion.

My other reason for writing separately is a pragmatic one, not one based in law as it were. It is simply to ask the bench and bar to cease using the phrase *open and obvious hazard* to describe a dangerous condition that is or should be readily apparent. Although the phrase doubtless has descriptive value, that value is swallowed by its tendency to perpetuate an ongoing blurring of the correct inquiry our modern comparative-fault regime now calls for. *Open and obvious* is a legal term of art invoking the now-defunct common-law doctrine immunizing premises owners from liability for injuries sustained as a result of such hazards. The notion that it might be divorced from its doctrinal meaning and used as any other adjective phrase is a pipe dream.

Instead, I would suggest employing more benign phrasing to describe such dangerous conditions—call them, say, *conspicuous and apparent hazards*, or something similar. While this word choice might not have the same rhetorical appeal as the assonant and familiar "open and obvious," it will more than make up for that in promoting clarity in arguments and analyses going forward. In my opinion, the historical meaning of *open and obvious* and the ingrained connotations it invokes are frustrating efforts to fully understand and properly apply the law as it now stands after the *McIntosh*-led line of cases. So for the sake of cutting through the apparent confusion that persists, and to facilitate our moving forward in this post-*McIntosh* paradigm, I recommend that we all, attorneys and jurists alike, make this change. All will benefit from retiring the phrase *open and obvious hazard* from our collective vernacular.

COUNSEL FOR APPELLANTS:

Yancey Lee White
Morgan & White Law Offices


COUNSEL FOR APPELLEES:

David Andrew Owen
Brian Michael Johnson
Matthew Atwood Stinnett
Dickinson Wright PLLC


COUNSEL FOR AMICUS CURIAE:

Christopher W. Goode
Bubalo Goode Sales & Bliss PLC



# Supreme Court of Kentucky

## 2014-SC-00641-DG

TERESA GRUBB AND RANDY GRUBB          APPELLANTS

ON REVIEW FROM COURT OF APPEALS
CASE NO. 2011-CA-000223-MR
V.        CLAY CIRCUIT COURT NO. 08-CI-00033

ROXANNE SMITH AND                     APPELLEES
SPEEDWAY SUPERAMERICA LLC

## ORDER DENYING PETITION FOR REHEARING

## AND MODIFYING OPINION

The Petition for Rehearing, filed by the Appellants, Teresa Grubb and Randy Grubb, of the Opinion of the Court, rendered March 23, 2017, is DENIED, and the Opinion of this Court is modified by substitution of the attached Opinion in lieu of the original Opinion of the Court. Said modification does not affect the holding of the original Opinion of the Court.

The Court modifies said Opinion by changing the first sentence in the first paragraph on page 42 to read as follows: "In sum, the Court of Appeals' opinion holding that the Grubbs' claims are barred by the open and obvious doctrine is reversed, and the trial court's findings of fact are reinstated, including any findings of fact regarding the amount of damages."

Minton, C.J.; Cunningham, Hughes, Keller, Venters and Wright, JJ., sitting. All concur. VanMeter, J., not sitting.

ENTERED: August 24, 2017.

_____
CHIEF JUSTICE